OZARK MILLS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 4377.   Promulgated April 30, 1927.

Petitioner's method of valuing raw cotton inventories on a cost basis by the use of perpetual inventories maintained by petitioner accepted in lieu of inventories submitted by the Commissioner or revised inventories on an average cost basis submitted by the petitioner.

*E. S. Parker, Jr., Esq.*, for the petitioner.
*Harold Allen, Esq.*, for the respondent.

The Commissioner determined deficiencies in income and profits tax for the fiscal year ending March 31, 1918, in the amount of $30,919.35, and for the fiscal year ending March 31, 1920, $15,678.33. The Commissioner determined no deficiency for the fiscal year ending March 31, 1919.

The petitioner claims that the deficiency for the fiscal year ending March 31, 1918, is $6,034.77, and that for the fiscal year ending March 31, 1920, there has been an overpayment of $19,035.83.

The principal controversy concerns the valuation of raw cotton which was in its inventories for the years involved. The fiscal year ending March 31, 1919, is considered only in so far as it is necessary in a determination of the deficiencies for the other years.

There is no disagreement between the parties as to the number of pounds of cotton on hand, in process or in finished goods at the beginning or end of any of the taxable years in question, nor is there any dispute that the actual cost of the cotton on hand at the end of each year was lower than replacement cost or market.

### FINDINGS OF FACT.

Petitioner is a North Carolina corporation with principal office and place of business at Gastonia. Prior to and during a portion of the year 1917, petitioner was engaged in the manufacture of ordinary cotton yarn. In the year 1917 it made changes in its plant, installed new and additional machinery and began the manufacture of high-grade cotton yarn with what is known as an English process for use in the making of soft collars and silk goods. This meant a change from the manufacture of ordinary cotton yarn, requiring a low grade of cotton, to the manufacture of a higher grade of yarn, requiring a large percentage of high-grade cotton. At that time petitioner was one in a very few, if not the only mill in the South so conducting its manufacturing operations. As a part of petitioner's process cotton of many grades was mixed and used at the same time. Never less than ten bales and usually about forty bales were opened at the same time and a certain quantity of cotton was taken from each bale and run through fifteen mixing machines. When the various grades of cotton became finished yarn, the cotton had been mixed thoroughly 2,948,000 times.

The amount of high-priced and low-priced cotton used in the mixture of raw cotton that goes into the yarn depends upon the number of the yarns being manufactured at the time, that is, whether fine or coarse, and the kind of yarn being manufactured at any particular

time depends upon market conditions. Because of this condition a supply of cotton of various grades is and was kept on hand sometimes for a period of two years. The keeping of cotton purchased from time to time on hand for a long period of time is further occasioned by the arrrangement of petitioner's warehouse facilities. Its warehouse, having a capacity of fifteen hundred bales of cotton, a supply sufficient to run petitioner for six months, has but one opening on the platform alongside the railroad, and as cotton is purchased it is stored as far back in the warehouse as possible for convenience in storing so that the various grades of the last cotton purchased are stored near the warehouse opening. In withdrawing cotton from the warehouse for manufacturing purposes, the cotton last purchased of the grade required is used first, leaving the cotton earlier purchased of the different grades in the rear of the warehouse. Petitioner uses from two hundred to two hundred and fifty bales per month.

Prior to and during the taxable years when cotton was purchased petitioner made a record upon its books of account of the date of purchase, the number of pounds, from whom purchased, and the price paid per pound. After purchases were received there was attached to each bale a tag containing this information and petitioner made a record in its cotton book of the particular bales, grade, cost, date of purchase, etc., of cotton withdrawn from the warehouse for manufacturing purposes but in the storing and handling of the cotton some of the tags were detached and lost, and in some instances tags detached by employees when withdrawing cotton from the warehouse never reached the accounting office, consequently no record was made of such withdrawals until a check was made of the cotton book with a physical inventory.

In the foregoing manner a perpetual inventory was maintained from which it was possible to determine the cost of raw cotton on hand and the cost of cotton entering into the manufacturing process. No physical inventories were taken until March 31, 1920, for the purpose of ascertaining the total cotton on hand and, from the tags which might still be attached, the date of purchase and cost per pound of such cotton. The inventory at March 31, 1920, showed a difference (a decrease) from the perpetual inventory of approximately 48,500 pounds, which difference the petitioner priced by taking the average cost of cotton for the preceding year, and reduced the perpetual inventory by this amount, which resulting amount was used in its original returns as filed. The only other change in the inventories as used in its returns from that shown by the perpetual inventory, of which we have been advised, was at March 31, 1918, when the inventory as shown by the books was reduced $8,863.07 and explained as " reduction in value."

In the revised inventories submitted to the Board, petitioner determined the cost per pound of raw cotton on hand at March 31, 1918, March 31, 1919, and March 31, 1920, on a weighted average basis by taking into consideration the opening inventories of raw cotton and the purchases of raw cotton made during the year. The weighted average costs so obtained were as follows: March 31, 1918, 28.989 cents; March 31, 1919, 35.903 cents; and March 31, 1920, 53.118 cents. These costs were used in the petitioner's revised inventories in valuing raw cotton which entered into goods in process and finished goods on hand at the above inventory dates, as well as the raw cotton inventory. The revisions as contended for by the petitioner were not made in the inventory at April 1, 1917.

The Commissioner, on the other hand, failing to find a physical inventory of cotton on hand at the end of each of the fiscal years mentioned taken at cost, proceeded to take from petitioner's books the most recent purchases to the extent of the number of pounds of cotton contained in the raw cotton inventory and used the cost of these purchases as the cost of the cotton on hand at each inventory date. To determine the cost of raw cotton in goods in process and in finished goods, the Commissioner used a weighted average cost per pound arrived at from sufficient recent purchases to equal the opening inventory for each year. The weighted average costs so arrived at were as follows: April 1, 1917, 21.86 cents per pound, obtained from purchases made from October, 1916, through March, 1917; March 31, 1918, 38.57 cents per pound, obtained from purchases made from October, 1917, through March 31, 1918; March 31, 1919, 38.9 cents per pound, obtained from purchases made from September, 1918, through January, 1919 (no purchases being made in February and March, 1919); and March 31, 1920, 80.6 cents per pound, obtained from purchases made from December, 1919, through March, 1920.

The Commissioner made no allowance for waste in manufacturing operations. During each of the fiscal years the actual waste in the number of pounds of raw cotton entering into the manufactured product was 30.69 per cent for the fiscal year ending March 31, 1918, 28.63 per cent for the fiscal year ending March 31, 1919, and 33.28 per cent for the fiscal year ending March 31, 1920. The average price received per pound for the waste was 22.65 cents, 30.21 cents, and 30.38 cents in each of the fiscal years in question.

The method of calculating waste and the percentage of waste as shown by the petitioner for the various years were accepted by the respondent at the hearing. Likewise, the petitioner conceded that the corrections which were made by the revenue agent in the raw cotton inventory on account of bales of cotton which had been opened but not yet put in process were correct.

Petitioner included depreciation on tenement houses in administration expenses and claims that the Commissioner erred in including this depreciation in manufacturing costs. The Commissioner now admits that the rent received from these houses should be deducted from depreciation which he has included in manufacturing cost. Due to the slight difference between the parties on this point the petitioner accepts this adjustment and the parties are otherwise in accord as to manufacturing costs.

The various items entering into the manufacturing costs (except the item for depreciation on tenement houses hereinbefore referred to) and the method by which cost of goods in process and cost of finished goods was determined, as shown by the petitioner were accepted by the respondent as being correct.

## OPINION.

LITTLETON: The only question in controversy in this case is the basis to be used in determining the cost per pound of raw cotton entering into the inventories of the petitioner for the taxable years ended March 31, 1918, and March 31, 1920.

Since the revenue agent who made the investigation failed to find inventory records from which it was possible to identify specific purchases of the goods on hand at the various inventory dates, he applied that part of article 1582, Regulations 62, under subdivision (a) with respect to intermingled goods, which is quoted below:

Goods taken in the inventory which have been so intermingled that they can not be identified with specific invoices will be deemed to be either (a) the goods most recently purchased or produced, and the cost thereof will be the actual cost of the goods purchased or produced during the period in which the quantity of goods in the inventory has been acquired, or * * *.

The petitioner takes exception to the use of this method on the ground that it is inequitable, in its case, to apply a method which is based on a presumption that the goods on hand are those most recently purchased when the facts rebut any such presumption, and maintains that an average cost based on acquisitions of raw cotton throughout each year and cost of raw cotton on hand at the beginning of each year, will furnish an inventory valuation with which its income can be more nearly reflected than that used by the Commissioner.

Section 203, Revenue Act of 1918, provides:

That whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

It will thus be seen that section 203 provides two tests to which each inventory must conform: (1) It must conform as nearly as may be to the best accounting practice in the trade or business, and (2) it must clearly reflect the income.

The basis of valuation most commonly used by business concerns and which is accepted by good accounting authorities is: (a) Cost, or (b) cost or market, whichever is lower. Whether this taxpayer used the first or second basis is not definitely established in this case and is not material since cost was always lower than market and, therefore, for the purpose of our determination we need only consider whether cost has been used in the raw cotton valuation by either of the bases contended for.

First, we are of the opinion that the basis used by the Commissioner is erroneous for the reason that the presumption on which it is based is clearly rebutted by the evidence presented. In other words, we do not conceive that there is any conclusive presumption that the goods on hand at a particular inventory date are those most recently purchased, but that such a rule is applied only as a rule of convenience where competent evidence to the contrary is not shown. To adopt it in this case would be to disregard the fact that it was the petitioner's practice to use the last goods purchased first; that its storage facilities were such that it was impracticable to follow any practice other than the withdrawal of the later purchases first and further that in 1917 it changed from the manufacture of a product which required the use of a low grade of cotton to the manufacture of a product which required the use of a greater percentage of high-grade cotton, and, therefore, the tendency was to use more of the high-grade cotton which was being purchased rather than the low-grade cotton, a supply of which was on hand when the change was made. Since this method is not shown to represent cost and since the presumption on which it is based has been rebutted, it must be disregarded in this case.

Secondly, does the method contended for by the petitioner in its revised inventories represent a cost valuation? It is what might be termed an average cost valuation in which the opening inventory and purchase of raw cotton during the year are considered to arrive at a weighted arithmetical average for a unit cost which is applied to the poundage on hand to determine the cost valuation. While this method in this case takes into consideration more factors than that employed by the Commissioner, we are not convinced that the petitioner's inventory so determined would be on a cost basis. Again this would seem to be another rule of convenience the application of which must be disregarded when a more nearly correct basis is available. For such a method to represent cost, so many factors, such as

purchase, sale and use of cotton, must concur in such an ideal manner, which we consider highly improbable of- having happened in this case, that the basis can not be approved as representing a true cost valuation.

More merit would attach to the taxpayer's method if we were dealing only with the fiscal year ended March 31, 1918, on account of its change in its manufacturing process for that year, but even here we are faced with the difficulty that only the closing inventory has been adjusted, which is not only contrary to good accounting practice, but also contrary to the principle of consistency which we have laid down on numerous occasions. *Appeal of Thomas Shoe Co.*, 1 B. T. A. 124; *Appeal of George C. Peterson Co.*, 1 B. T. A. 690; *Appeal of Buss Co.*, 2 B. T. A. 266, and other subsequent decisions.

Finally, we are of the opinion that it is unnecessary to resort to either of the above arbitrary bases when a basis which more nearly reflects cost is available. The petitioner showed that it keeps a perpetual inventory in the form of a cotton book, in which it lists each bale of cotton purchased with the number of the vendor and that of the petitioner, the actual weight, price per pound, and name of the vendor. When cotton is withdrawn for consumption, the bale used is checked off so that at the end of any period it would be possible to determine not only the number of pounds on hand, but also its actual cost. It would not be an average cost in any sense, but instead a true cost based on actual purchases of cotton not consumed, even if the cotton on hand had been purchased several years prior to the date on which the valuation is made.

The following testimony by petitioner's bookkeeper which was given in answer to questions by petitioner's counsel, shows the method which was followed in keeping this cotton book and determining the inventory therefrom:

Q. Mr. Gardiner, when cotton was purchased, what entries did you make on your mill books?

A. On my mill books I made the entries from whom I buy the cotton, the total amount of pounds, the dollars and cents. That goes on the journal. Then I have a cotton book that I take and put each and every bale separate, and put on the number. It may start at 695 and run up to 745, run up fifty numbers. It has their number on it and my number, and then I put the actual weight of the cotton in the cotton book and the price, and where it is bought from.

Q. When you withdraw that cotton from the warehouse to be used, what entry do you then make on your cotton book?

A. I take it out on my cotton book as being used, with a check mark; I put on the pounds and the tag and also the price, and put them all together. In a month's run, using maybe 275 bales, I have fifty bales of one price, five of another, a half dozen of another and so on. I sort them all out and get the different prices on the different piles and take an adding machine and run them

up and multiply them by the prices paid for them and charge it out to cotton consumed.

Q. At the close of the year, when you made your inventory, you said that the cotton was stacked in the warehouse where you could not readily get to it. Did you check that against your cotton book as to the actual bales on hand?

A. I checked up the actual bales on my ledger.

Q. I mean the numbers of the bales.

A. No, I didn't.

Q. How did you make up your inventory?

A. Whenever it was so I could not get at it to count the cotton and get the tags, I took the pounds on the left-hand side, the pounds and the dollars and cents it cost, and on the right-hand side the pounds and dollars and cents that had been consumed, and I took the difference and made an average price.

Q. That was the way you took it?

A. When I couldn't count it.

Q. When you could count it?

A. When we could count it, we did it exactly as we charged it out—run over and put the price on it and the pounds.

Q. Was that book kept during the fiscal years of 1918, 1919 and 1920?

A. Yes, sir.

The cost so determined, barring inaccuracies, would not be an average price, as inaccurately referred to by the witness, but would be an actual cost. The physical count, to which he referred, is understood to be the physical inventory which was taken only at March 31, 1920, in so far as the years on appeal are concerned.

The petitioner offers objection to this method on the ground that its cotton book contains inaccuracies in that tags are lost off the bales and, therefore, it is not possible to identify such specific bales used, and that tags are not always returned by the employees when the cotton is withdrawn and, therefore, no entry can be made in the cotton book. Again, we fail to see where the method advocated by the petitioner would serve to correct either of these errors, as in both methods the number of pounds would be excessive by the same amount. Errors of both types would be corrected when a physical inventory is taken, but we do not have a physical inventory, except at the close of 1920, and, therefore, we must depend on the most reliable information available which seems to be the perpetual inventories maintained. These inventories are undoubtedly faulty, but they at least represent an attempt to arrive at a cost valuation, and, the percentage of error is small when we consider that from April 1, 1917, to March 31, 1920—the latter date being the only time within the three years when a check was made of the cotton book with the physical inventory—a difference of approximately 100 bales was found when a physical inventory was taken and in that period approximately 6,000 bales were consumed, or a percentage of error of only 1.67 per cent. The following testimony by petitioner's bookkeeper on cross examination by respondent's counsel further indicates the accuracy of petitioner's cotton book:

Q. The only time where you do not take the actual tag and the actual price is where the tag may be ripped off?

A. Where the tag is ripped off and we cannot get to them.

Q. Do you find any such discrepancy between the actual inventory and the book inventory as 48,000 pounds in any one year now?

A. Not in any one year. There may be over a period of years. We find a discrepancy every year between what we ought to have and what we have in the records.

Q. There is no such discrepancy in any one year now, is there?

A. No, not in any one year. What you have reference to might run over a couple of years. I don't know.

Mr. LITTLETON. When you can't find the tags, can you tell by the position of the bale when it was probably purchased?

The WITNESS. No, sir. We have no record of it. We just take what we have left and make up our stock accounts.

Mr. LITTLETON. You keep a record as you purchase cotton?

The WITNESS. Oh, yes.

Mr. LITTLETON. Then when you check the bales that have tags on them, you can check that against the bales that have no tags?

The WITNESS. When we get bales that are short, we are short just that much. That will go in the year's production.

By Mr. ALLEN.

Q. That doesn't happen to many bales now, does it?

A. Not to very many bales lately. But we have it to happen to a few bales every year.

We, therefore, are of the opinion that the petitioner's raw cotton inventories, for the years on appeal, should be valued by the use of the perpetual inventories which it maintains. Correction should, of course, be made on account of the difference in poundage found by the revenue agent and on account of the arbitrary reduction in value at March 31, 1918. Similarly, adjustment should be made to the physical inventory at March 31, 1920, where a difference of approximately 48,500 pounds is shown. We are of the opinion that a reasonably accurate method of adjusting this difference would be to consider that to this extent cotton was not properly recorded when withdrawn over the three-year period from April 1, 1917, to March 31, 1920, and reduce the closing inventories of each of the years on the basis of the poundage consumed in each year, pricing the cotton entering therein on the basis of the average cost for the respective grades during each of those years.

This method would seem to be substantially in conformity with the alternative method suggested in article 1582, Regulations 62, which was improperly disregarded by the revenue agent and which reads as follows:

* * * Or (b) where the taxpayer maintains book inventories in accordance with a sound accounting system in which the respective inventory accounts are charged with the actual cost of the goods purchased or produced and credited with the value of goods used, transferred, or sold, calculated upon the basis of the actual cost of the goods acquired during the taxable year

(*including the inventory at the beginning of the year*) the net value as shown by such inventory accounts will be deemed to be the cost of the goods on hand.

As to the method which the petitioner used in determining the cost of cotton consumed, we have the following testimony from the petitioner's bookkeeper:

Q. In arriving at the cost of cotton consumed, would you take it by the actual cotton or the average cost?

A. Take it by the actual price in pounds.

Q. Would that represent the actual cotton that went in, or your estimate of it?

A. The actual cotton that went in. We have the cotton tag, and we take the number on it and the weight, and when the card comes back I put the weight on it and the price.

In this manner, the petitioner has a fairly accurate record of the cost of cotton which enters into consumption, barring the inaccuracies which we referred to under the raw cotton inventory. The petitioner showed further that the manufacture of cotton is a continuous process in which the cotton is placed in process and continues until the finished goods are obtained. We would not have the situation of goods in process on hand at an inventory date which had been placed in process several months or years prior thereto, but it would only be recently placed in process. We are, therefore, of the opinion that a reasonably accurate method of valuing the raw cotton which entered into such goods would be on the basis of the cost of raw cotton most recently placed in consumption prior to the respective inventory dates, sufficient to equal the poundage in such inventory.

With respect to finished goods, we find that the total poundage on hand at each inventory date is very small as compared with the total production or total sales, representing in one instance less than one per cent of the total sales in pounds for the preceding twelve months. This would indicate that yarn is being produced as it is sold and that there is not on hand an appreciable accumulation which had been produced from cotton put in process long before the various inventory dates. We are, therefore, of the opinion that the same method should be followed in valuing raw cotton entering into finished goods as goods in process, viz., use the cost of raw cotton most recently placed in process prior to the various inventory dates sufficient to equal the total poundage in the finished goods inventory.

A redetermination should, therefore, be made in accordance with the foregoing, taking into consideration the adjustments with respect to waste, depreciation of tenements, and the various items entering into manufacturing costs on which both parties are agreed.

*Judgment will be entered on 30 days' notice, under Rule 50.*