MADISON GAS AND ELECTRIC COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8669–74.    Filed June 21, 1979.

*Eli H. Schmukler, Leonard S. Sosnowski, John M. Koeppl, William T. Rieser, Gregory E. Scallon,* and *Joseph R. Barnett,* for the petitioner.

*Joseph R. Peters* and *Arturo Estrada,* for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's Federal income tax for the taxable years 1969 and 1970 in the amounts of $36,887.50 and $65,258.31, respectively.

The issues for decision are:

(1) Whether respondent erred in changing petitioner's method of accounting for coal consumed at one of its generating plants;

(2) Whether the amounts of $33,418.45 and $114,434.27 for the years 1969 and 1970 paid by petitioner as training and related expenses of a new nuclear power plant being constructed by petitioner and two other electric utility companies on a joint participating basis are deductible as ordinary and necessary business expenses in the year of payment or are capital expenditures; and

(3) What is the fair market value of two parcels of real estate contributed by petitioner to a charitable organization in 1968 and 1969.

## FINDINGS OF FACT

All of the facts with respect to the first two issues have been stipulated and some of the facts with respect to the third issue have been stipulated. The stipulated facts are found accordingly.

Petitioner Madison Gas & Electric Co. is a Wisconsin corporation which had its principal place of business in Madison, Wis., at the time of filing its petition in this case. Petitioner filed timely Federal income tax returns for the calendar years 1969 and 1970 with the Internal Revenue Service Center, Kansas City, Mo.

Petitioner is an operating public utility which is and has been engaged in the production, purchase, transmission, and distribution of electricity and the purchase and distribution of natural gas since its incorporation in 1896. During the years here in issue, petitioner rendered retail electric service to some 73,000 residential and commercial customers in a service area of around 220 square miles in Dane County, Wis. Petitioner also sells a small percentage of its electrical power to other utilities within Wisconsin. Although it sells excess power to other utilities, petitioner's responsibility is to the customers in its service area.

Petitioner is and has been a regulated public utility subject to the jurisdiction of the Public Service Commission of Wisconsin (PSC) and the Nuclear Regulatory Commission (NRC). The Federal Energy Regulatory Commission (FERC), which encompasses the former Federal Power Commission, has or may have jurisdiction over petitioner under the Federal Power Act.

Under law, petitioner is and has been required to furnish reasonably adequate service and facilities to customers within its service area at rates found reasonable and just by the PSC.

Petitioner has exclusive franchises to electric service in most of the geographic region covered by the Wisconsin cities of Madison, Middleton, and Monona, and the adjoining villages of Shorewood Hills and Maple Bluff. The number of customers within petitioner's service area has grown rapidly and continuously over the past 25 years. At the time of the trial of this case, it included approximately 78,000 residential and 11,500 commercial and industrial electric customers. The customer demand for electricity has increased because electricity was substituted for other forms of energy, commercial customers expanded, and high-energy devices such as air conditioning units became prevalent.

Petitioner is required to keep its books and records in accordance with the FERC Uniform System of Accounts for Public Utilities and Licensees (Class A) and in accordance with the National Association of Regulatory Utility Commissioner's Uniform Systems of Accounts for Class A and B Electric Utilities as modified by the PSC. Petitioner has maintained its books and records in accordance with these systems. Petitioner has always maintained its books and records on an accrual basis of accounting and reported its income on a calendar year basis. Throughout the years in issue, petitioner maintained adequate books and records as required by the Internal Revenue Code and the regulations thereunder. The books are clear and were maintained in a fair, honest, and accurate manner.

Throughout its existence, petitioner has used the same method of accounting for coal consumed at its Blount Street facility in filing its State and Federal income tax returns as it has used in maintaining its corporate books and in preparing all reports to its shareholders, to the PSC, to the FERC, and for all purposes. This is true of petitioner's overall method of accounting as well as the way in which it accounts for coal.

Throughout its operating history, petitioner has sought to insure that electrical energy was always available to the customers within its service area and that the rates paid by its customers were as low as reasonably possible. In keeping with this objective, petitioner has continuously analyzed the present and future demand for electricity within its service area and has kept abreast of technological developments and methods available to supply its customer demand.

Within the last 20 years, the following alternative sources

have been available to petitioner for producing or obtaining the electrical power which is sold to its customers:

(a) Steam-driven turbine generators—steam produced by burning coal.

(b) Steam-driven turbine generators—steam produced by burning natural gas.

(c) Steam-driven turbine generators—steam produced by burning oil or other petroleum products.

(d) Steam-driven turbine generators—steam produced by nuclear fission.

(e) Direct natural gas or petroleum powered turbine generators—no steam, similar to jet engine.

(f) Interconnection with, and power purchasing agreements with, other electrical utilities.

(g) The undertaking of any of the above with another utility in a cost-sharing arrangement to take advantage of the economies of scale.

Each time petitioner decided that its electrical supply required expansion to meet rising demand, it considered all of the above alternatives in light of the following factors:

(a) The cost and availability of fuel supplies, labor, and capital;

(b) ecological considerations; and

(c) a variety of other pertinent factors.

For much of its operating history, petitioner was able to meet its customer demand by operation of its Blount Street facility (Plant 1) located in downtown Madison. As a result of petitioner's analysis of the various factors described above, Plant 1 was originally constructed to produce electricity primarily from coal fired steam turbine generators. The number of these units, however, has increased from time to time and has been supplemented by both gas and oil fired steam generators which have brought the plant's maximum continuous capacity to 194,000 kilowatts. The decision to use gas and oil generators to supplement the coal fired steam generators, rather than using additional coal fired units as a supplement, was based upon petitioner's analysis of costs and the availability of alternative sources at the times the decisions to expand Plant 1 were made.

After making a similar analysis, petitioner installed several gas powered turbine generators at other locations within its service area between 1964 and 1973. These units were designed

to help handle peak demand loads and increased petitioner's wholly owned maximum continuous capacity to 309,000 kilowatts.

At other times during its operating history, petitioner's customer demand and its analysis of the cost and technological considerations have led it to interconnect its transmission systems with those of Wisconsin Power & Light Co. and Wisconsin Electric Power Co., enter into contracts covering the purchase and sale of excess electrical power, and to own and operate additional facilities in conjunction with other electrical utilities.

Plant 1 consisted of several acres of land upon which were located coal fired boilers used to produce steam for turning generators in the production of electricity. Also, located at Plant 1 was additional electrical generating apparatus. Across the street from Plant 1 was another parcel of land owned by the petitioner which served as a coal yard.

Throughout the years of petitioner's existence, coal has been the primary fuel for producing steam in the Plant 1 boilers. None of the coal was acquired by petitioner for resale.

In the earlier years of petitioner's existence, coal was brought to Plant 1 by train daily. The coal was either dumped from the railroad cars into a pit below the railroad tracks and then lifted by a crane-type device into a coal bunker above the boilers, or the coal was removed directly from the railroad cars and lifted into the bunker above the boilers. The size and frequency of the deliveries were such that coal delivered to Plant 1 on a particular day would usually be consumed that day or very shortly thereafter. Subsequently, the coal which had been placed in the bunker was fed into the boilers when needed.

Because of the possibility of railroad strikes, coal miner strikes, natural disasters, and a variety of other unpredictable events, petitioner maintained several large piles of coal (reserve piles) at Plant 1 and other locations in and near the City of Madison. Coal was neither added to nor taken from any of these piles on a daily basis.

Except in the case of interruption of daily deliveries of coal to Plant 1, the reserve piles were rarely touched by petitioner. Petitioner's primary reason for not using the reserve piles as a working supply of coal was that freshly stacked coal can be subject to spontaneous combustion. The likelihood of such

combustion diminishes as time passes. For that reason, petitioner was very reluctant to add to or remove coal from a longstanding reserve pile.

Although the situation arose infrequently, if the deliveries of coal on a particular day exceeded petitioner's consumption of coal on that day, the excess was generally placed on the edge of the newest reserve pile. Similarly, if an insufficient amount of coal was delivered on a particular day, so that coal had to be taken out of a reserve pile, coal would generally be removed from the edge of the newest reserve pile.

The procedure described above continued for many years, but was modified slightly in the later years because of modern technology. In the 1960's, petitioner opened other plants for the generation of electricity, none of which used coal. Plant 1, although improved by the addition of several boilers, some of which were gas or oil fired, continued to depend primarily upon coal for production of electricity.

During the years in issue, the deliveries of coal to Plant 1 were less frequent than they had been in the past. Coal was delivered to the plant several times each week and the size of the shipments was increased. Usually, the coal in a given shipment was no longer consumed totally on the day of delivery; however, coal delivered during one shipment was generally consumed before the delivery of the next shipment. In fact, the railroad cars used to deliver the coal often stayed 2 or 3 days at Plant 1 so that the coal could be unloaded directly from the cars into the bunker above the boilers where it would be used almost immediately. The reserve piles continued to be maintained.

Although the situation rarely arose, petitioner still took any excess coal not consumed by the next delivery and put it on the edge of the most recently established reserve pile. Also continued was petitioner's practice of removing coal from the edge of the most recently established reserve pile if an unusual situation arose and extra coal was needed. The reserve piles were not and still are not used as working piles from which coal is taken or to which coal is added on a daily, weekly, or monthly basis. Several of the piles which were maintained by petitioner during the years in issue had not had coal added to or taken from them for many years.

Although the total amount of coal consumed annually at Plant 1 has not varied significantly over the last 70 to 80 years, except

for consumption attributable to the addition of new boilers, the cost of the coal consumed in proportion to the total cost of electricity produced has dropped because over 50 percent of the total electricity sold by petitioner in 1969 and 1970 was produced either by using alternative fuels or at plants which did not consume coal.

The following activities took place and the following records were kept by petitioner with regard to the coal received and consumed at Plant 1 during the years in issue:

(1) Coal companies notified petitioner of their shipment of coal indicating the date of shipment, the railroad car number, and the weight of coal for each car. This information was recorded in a monthly car record.

(2) When the railroad received the cars in their Madison stockyard, they notified petitioner indicating that the cars were in their possession. The car record was then updated with this information.

(3) Upon delivery of the cars to petitioner's railroad siding located at Plant 1, one of petitioner's supervisors prepared a spotting slip. This spotting slip showed the date, time of day, and track where a particular car was spotted. This information was recorded on the car record.

(4) When a car was unloaded, the craneman completed a record showing the car number, the number of buckets conveyed, the time at which the unloading took place, and the location at which the coal was unloaded. This information was recorded on the craneman's car report of coal unloaded.

(5) Similar records were maintained for all other movements.

The method used by petitioner in accounting for the value of the coal consumed at Plant 1 during its taxable year is, and was during the years in issue, as follows:

(a) The cost, including transportation charges and coal handling expenses, of each ton of coal purchased during a month is taken from the coal invoices and recorded in an account for the coal. The average price for a ton of coal purchased that month is then computed and recorded.

(b) The cost of coal consumed during a month is the product of the tonnage consumed and the average price per ton of coal purchased during that month.

(c) The cost of any coal consumed during a month is drawn from the account for coal based on that month's average cost.

Accordingly, the monthly tonnage increment is decreased for the current month's tonnage consumed.

(d) Coal consumed during a month which is in excess of that month's purchases is treated as if it were the prior month's increment, if any. To the extent that the month's increment contains coal which was not previously used, the cost of the coal consumed during a month in excess of the purchases for that month is the product of the excess tonnage consumed and the average price per ton of the coal purchased for the prior month. To the extent that the excess coal consumed exceeds the tonnage of coal remaining in the prior month's increment, it is treated as if it were coal which is accounted for in the next preceding month's increment. It is costed accordingly. This process continues until the total of the tonnage so obtained and costed is equal to the total consumed in the current month.

(e) The yearend value of the unused coal on hand is the sum of the products of all previously unused monthly tonnage purchases and the corresponding monthly average costs.

This method of accounting for the consumption of coal was selected by petitioner because, in its opinion, (a) it best suited petitioner's needs, (b) most nearly approximated the actual physical handling of the coal, and (c) clearly reflected petitioner's income.

This method of accounting for the coal consumed has been used consistently by petitioner not only for every year since 1953 but has been used by petitioner since the 1930's and petitioner's records indicate that it has been used since petitioner's formation.

The method of accounting for coal which is used by petitioner and the method of accounting for coal to which respondent desires petitioner to change are both methods of accounting for coal which comply with generally accepted accounting principles for financial accounting purposes.

For each of the years 1949 through 1970, excepting 1951, 1952, and 1968, respondent audited the Federal income tax returns filed by petitioner. Petitioner's Federal income tax returns for some of the years 1940 through 1948 were also audited by respondent.

Petitioner maintained financial records such as a general ledger, voucher distribution registers, materials and supplies invoices, other invoices, stock cards for its perpetual records

regarding coal on hand, periodic reports to the FERC, the Securities and Exchange Commission, and the PSC (including audit reports), purchase orders, the coal costing book, as well as other records which detailed its acquisition, movement, consumption, pricing, and method of accounting for coal, including all contracts covering the purchase of coal. All of these records were made available to respondent's revenue agents in each of the years in which petitioner's Federal tax returns were audited. No adjustment, however, was made by respondent to petitioner's taxable income on the basis of an improper method of accounting for coal in any year prior to the years here in issue. The agents of respondent who conducted the audits for the years 1953, 1954, and the years 1962 through 1967, did not specifically review petitioner's method of accounting for coal. Over the course of its years of operation, petitioner was regulated and audited by the FERC and the PSC. These agencies were fully aware of petitioner's method of accounting and neither of these agencies ever disallowed petitioner's use of its coal accounting method.

The rate which petitioner may charge for electricity supplied to its customers is established by the PSC after considering all of petitioner's operating expenses and other factors. The PSC specifically required and allowed petitioner to use the method of accounting for coal which it has consistently used as set forth above in determining the cost of coal consumed, which is considered an expense for ratemaking purposes.

From the time petitioner was incorporated until the years in issue, the cost of coal varied. From 1937 through 1969, the cost per ton of coal in Madison, Wis., was generally rising although in six instances during these years the average cost per ton for a later year was less than for the preceding year. In 1937, the average cost per ton of coal in Madison was $3.70, in 1968 it was $8.31, and in 1969 this average cost per ton was $9.34. The average price paid by petitioner for a ton of coal purchased during the period 1937 through 1969 was equal to the average cost of a ton of coal for the year of purchase in Madison, Wis.

During the years 1937 through 1967, the number of tons of coal purchased by petitioner each year was approximately the same as the number of tons used each year with small underages of purchases in certain years and small overages in others.

During the year 1968, petitioner purchased 134,110 tons of coal

and used 122,236 tons, and during the year 1969, purchased 141,323 tons and used 118,656 tons. During the entire period 1937 through 1969, petitioner purchased 5,202,623 tons of coal and used 5,162,149 tons.

The total cost of coal consumed by petitioner as determined under its method of accounting for the years 1937 through 1969 was $37,029,570. The cost of coal consumed by petitioner for 1968 and 1969 determined under its method of accounting was $1,051,193 and $1,142,129, respectively.

Petitioner has never filed a Form 970, Application to Use a LIFO Inventory Method. Had petitioner begun using a FIFO method of accounting for coal in 1936, its total cost of coal consumed from 1937 through 1969 would have been $36,771,544 and for the years 1968 and 1969 would have been $1,017,161 and $1,089,112, respectively.

The cost of coal consumed under petitioner's method is only seven-tenths of 1 percent higher than it would have been had petitioner used the method of accounting now suggested by the Commissioner in computing its cost of coal consumed for the 32-year period ending with the last year in issue.

Although Plant 1 could provide almost two-thirds of petitioner's total electrical generating capacity, in 1961 following the addition of another coal fired generator at Plant 1, it became evident that the rapidly increasing demands for power in petitioner's service area would have to be supplied from sources other than Plant 1. In addition, it became apparent that operating inefficiencies associated with many generators at Plant 1 were increasing because of their age; that the availability of oil and gas for generation was limited; and, that the environmental concerns were growing, specifically with the facility's emissions and in general with the use of coal powered facilities. Petitioner again studied the various near-term and long-range possibilities for meeting the power demands of its customers. The efficiencies and costs of different types of plants, technologies, fuels, and other alternatives were analyzed by petitioner in conjunction with the energy policies of the PSC for the State of Wisconsin. As a result of this analysis, petitioner determined that a mixture of facilities, fuels, and power-sharing arrangements should be pursued in order to avoid becoming dependent on a single energy source. For example, the gas turbine generators were chosen as a means of meeting only

peakload demands. Petitioner also entered into studies and negotiations with other major utilities in eastern Wisconsin that had similar demand problems and arranged to participate in a long-range plan to assure an adequate and reliable power supply for the future. The small gas turbine stations installed by petitioner were only a solution to peakload demand.

As a result of petitioner's planning, it was determined to pursue three principal avenues of power supply:

(a) Power supply agreements with other Wisconsin utilities;

(b) Interconnection and power purchase contracts with Wisconsin Electric Power Co.;

(c) Construction of new baseload plants, plants designed to meet the normal general demand for electricity rather than peak demand, and related transmission networks.

The policy of the PSC was to encourage utilities to participate in the construction of plants owned by more than one company in order to achieve the economies of scale. Petitioner's planning was in accordance with policies of the PSC.

Joint participation in the ownership and operation of generating facilities, especially nuclear plants, is common in the industry. Of the 155 nuclear plants operating or under construction in the United States, 52 are owned by more than one utility. In addition, a substantial number of large fossil fuel powered plants are owned by more than one utility. It is also the practice of utilities to enter into arrangements with other utilities such as interchange agreements and power pooling arrangements.

Pursuant to its planning to meet customer energy demands and its analysis of the available alternatives, petitioner decided to join Wisconsin Public Service Corp. (WPS) and Wisconsin Power & Light Co. (WPL) in constructing coal and nuclear plants and certain transmission facilities. To otherwise help provide for petitioner's future energy demands and to utilize the economies of scale, petitioner entered into various agreements with WPS and WPL, including an agreement dated February 2, 1967, and entitled "Joint Power Supply Agreement" (agreement).

In summary, the agreement provides:

(a) That petitioner and the other utilities wished to obtain the benefits of advanced technologies and the economies of scale and to make the most effective use of power facilities by sharing in

the ownership and operation of certain major generation and transmission facilities;

(b) That petitioner would be admitted into the power pool agreement between WPS and WPL, which is an arrangement for sharing each utility's reserve generating capacity. It provides for the sale and purchase of capacity among the participating companies in order to equalize the reserves of each utility;

(c) That WPS, WPL, and petitioner would construct and own as tenants-in-common a nuclear plant to be located in northeastern Wisconsin having a name-plate capacity of 527,000 kilowatts (the terms of this portion of the agreement are more fully set forth below);

(d) That WPS, WPL, and petitioner would each construct and own a segment of a 345 kilovolt transmission line; and

(e) That WPS, WPL, and petitioner would plan for the construction of a future facility (the 1976 unit) to be owned as tenants-in-common.

The site selected for the 527,000 kilowatts nuclear plant (Plant 2) by the utilities was on the west shore of Lake Michigan in the town of Carlton in Kewaunee County. The plant is known as the Kewaunee Nuclear Power Plant.

Article III of the agreement, which is entitled "Nuclear 527 MW Plant (1972)" provides in part as follows:

Section 3.01. *Ownership Shares.* The Companies hereby provide for the construction and operation of a nuclear energy plant (herein called the "Nuclear Plant") of approximately 527,000 KW name-plate capacity, to be located in northeastern Wisconsin, and to be owned by the Companies as tenants in common with undivided ownership interests as follows (in this Article III referred to as their respective "Ownership Shares"):

|  | Percent |
|---|---|
| Wisconsin Power and Light Company | 41.0 |
| Wisconsin Public Service Corporation | 41.2 |
| Madison Gas and Electric Company | 17.8 |

Section 3.02. *Construction Committee.* Construction of the Nuclear Plant shall be carried out by the Companies under the direct supervision and direction of Service Company [WPS] and under the general policy supervision and direction of a Construction Committee to be established by the Companies. All of the Companies shall be represented on the Construction Committee and the voting power of the representatives of each Company shall be in proportion to the Ownership Share of such Company. The vote of the representatives of Companies having Ownership Shares aggregating more than 50% shall be controlling on any question to be determined by the Construction Committee. The Companies and their representatives on the Construction Committee shall

use their best efforts toward the end that the Nuclear Plant will be completed, and commercial operation commenced, on or about June 1, 1972.

\* \* \* \* \* \* \*

Section 3.04. *Initial Major Contracts.* Service Company is hereby authorized and directed, in the name of and as agent for Power Company and Electric Company and also in its own behalf (all in the same percentages of interest as their respective Ownership Shares), forthwith to enter a firm contractual commitment (subject to regulatory approvals) with Westinghouse Electric Corporation in accordance with its proposal dated October 21, 1966 as modified by its letter dated December 7, 1966, covering the nuclear steam supply and turbine generator.

Section 3.05. *Other Contracts.* The Companies shall, with reasonable expedition, enter into or authorize the entry on their behalf into other contracts (which may be purchase order contracts) providing for (a) the purchase of materials, equipment and service for, and construction of, the Nuclear Plant and (b) insurance to insure all work under construction against risks usually insured against for such work. Each initial or other contract shall provide, among other things, that the performance of the contract shall be for the account of, and the charges therefor shall be billed to, and paid by the Companies in proportion to their respective Ownership Shares and that the invoices for such billing (Contractor's Invoice or Invoices) shall be submitted in the names of the Companies, in the care of Service Company. For their convenience the Companies may authorize Service Company or an individual or individuals to execute and deliver on behalf of the Companies all such other contracts to be entered into pursuant to this section.

Section 3.06. *Books and Records.* Books of account and records containing details of the items of cost applicable to the construction of the Nuclear Plant and to its operation and maintenance shall be kept by the Operating Company referred to in Section 3.10 and shall be open to examination at any time by the other Companies or their representatives. The Operating Company shall furnish the Companies with summaries or counterparts of such books of account and records as may be necessary to satisfy all applicable regulatory requirements.

Section 3.07. *Expenditures.* All expenditures in respect of the Nuclear Plant shall be accounted for in accordance with the Uniform System of Accounts prescribed by the Federal Power Commission for Public Utilities and Licensees (Class A and B Electric Utilities).

All expenditures (including, but not limited to, expenditures for administration, labor, special training costs, payroll taxes, employee benefits, maintenance, materials, research and development, supplies and services), for the licensing construction, operation and maintenance of the Nuclear Plant and for renewals, replacements, additions and retirements in respect thereof shall be shared by the Companies in proportion to their Ownership Shares. Expenditures of Service Company incurred prior to or after the date of this Agreement in connection with preliminary planning for the Nuclear Plant shall be treated as expenditures on behalf of all of the Companies and the other Companies shall reimburse Service Company for their respective ownership proportions of the cost thereof.

Interest charges on borrowed funds, income taxes, and property, business and occupation and like taxes, of each Company shall be borne entirely by such Company; and such items, as well as depreciation, amortization, and interest charged to construction, shall not be deemed expenditures for purposes of this Section.

Section 3.08. *Funds.* Whenever and so long as the Operating Company or a majority of the Companies may so demand, the Companies shall maintain a joint account or accounts (collectively, the "Joint Account") in a bank or banks approved by the Operating Company, the title of which Joint Account shall be in the respective Companies in proportion to their Ownership Shares. While so maintained and unless otherwise agreed by the Companies, all construction and capital expenditures, and all other expenditures referred to in the second paragraph of Section 3.07, shall be paid out of the Joint Account.

From time to time the Operating Company may request the Companies to advance such amount as is then needed for cash working capital for the plant project. Within ten days thereafter, or from time to time as specified in such request, the Companies, pro rata according to their respective Ownership Shares, shall deposit the amount specified in such request. Such deposit shall be made in the Joint Account, if such account is being maintained at the time for such purpose; otherwise, such deposit shall be made to the credit of the Operating Company in a bank designated by it.

As promptly as practicable after the end of each month, the Operating Company shall send to each of the Companies a statement in reasonable detail of all expenditures for such month and the amount of each Company's share thereof.

The Operating Company shall cause to be drawn and to be delivered on behalf of the Companies, from funds so provided, checks or drafts in payment of expenditures. Funds so provided shall be disbursed in accordance with sound accounting and disbursement procedures. All persons authorized to handle or disburse funds from the Joint Account shall be bonded in favor of the Companies as their respective interests may appear, for such amounts as the Construction Committee may determine. The Operating Company accepts sole responsibility for the handling or disbursement of funds deposited to its credit.

\*      \*      \*      \*      \*      \*      \*

Section 3.10. *Operation and Maintenance.* The Companies shall establish an Operating Committee for the purpose of establishing general policies for the operation and maintenance of the Nuclear Plant. All of the Companies shall be represented on the Operating Committee and the voting power of the representatives of each Company shall be in proportion to the Ownership Share of such Company. The vote of the representatives of Companies having Ownership Shares aggregating more than 50% shall be controlling on any question to be determined by the Operating Committee. The Operating Committee shall meet at the call of any member.

The Nuclear Plant will be directly operated and maintained by the "Operating Company" in accordance with good utility operating practices and the general policies to be established by the Operating Committee. Until otherwise agreed by all of the Companies, Service Company shall be the Operating Company, and the Atomic Energy Commission licensee. It shall

operate and maintain the Nuclear Plant in the same manner as if it were one of its own generating stations, utilizing its own employees and supervisory personnel as required in the performance of this Agreement, and any independent technical advisors which it may select, and otherwise acting in all respects as though it were an independent contractor engaged by the Companies to be responsible for the result to be attained, i.e. generation of power and energy at the Nuclear Plant, as economically as possible, and delivery thereof to the connected 345 KV transmission system for transmission to the Companies, the Operating Company having sole responsibility for the specific manner of attaining that result. During operation conditions which the Operating Company in its sole judgment deems abnormal, the Operating Company shall take such action as it deems appropriate to safeguard equipment and to maintain service of the Nuclear Plant.

In hiring additional employees for work at the Nuclear Plant, the Operating Company will give reasonable preference to qualified employees of the other two Companies who express their desire to work at the Nuclear Plant and have the consent of their respective Companies to make an application.

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

Section 3.12. *Title to Property.* Title to all property, whether real, personal or mixed and whether tangible or intangible and including without limitation property acquired for use or consumption in connection with its construction, operation or maintenance, and all options or contract rights for the acquisition of real property as the proposed site or as alternate sites for the Nuclear Plant, now owned or hereafter acquired or constructed for the purposes of the Nuclear Plant, whether held at any time or from time to time in the name or names of one or more of the Companies or of any nominee, agent or contractor of any one or more of the Companies, shall at all times be in the Companies as tenants in common with undivided interests in proportion to their Ownership Shares. Construction, acquisitions and purchases shall be made in such manner that title shall vest in accordance with the foregoing. All titles and interests of the Companies as such tenants in common shall be subject from inception to the provisions of Article VI hereof. Any alternative property acquired but not necessary for the Nuclear Plant shall be disposed of in accordance with the direction by the Construction Committee.

Section 3.13. *Mutual Confirmation of Title.* In order further to confirm and establish their intended ownership in accordance with their respective Ownership Shares, each of the Companies hereby sells, assigns and transfers to the other Companies, as tenants in common, all legal, equitable or other interest in any property referred to in Section 3.12 whether now owned or hereafter acquired, which it may at any time have in excess of its respective Ownership Share, in each case in such proportions to each other Company so that the entire interest of the Companies in such property shall be owned in the manner and in the respective Ownership Shares herein provided.

Each of the Companies agrees that from time to time, upon request by either of the other Companies, it will execute and deliver such further documents or instruments of transfer or confirmation of titles as may in the opinion of counsel for the requesting Company be necessary or advisable to legally effectuate and carry out the intent and purpose of this Agreement.

Section 3.14. *Power and Energy*. Subject to Sections 3.09 and 3.10, each Company shall at all times have full ownership of and available to it at the Nuclear Plant the portion of the generating capability of the Nuclear Plant and the energy associated therewith, corresponding to its Ownership Share. Each Company shall keep the Operating Company informed as to the amount of power it requires to be generated for it. Subject to its capability, operating conditions and necessary or unavoidable outages, the Nuclear Plant shall be operated so as to produce a minimum output equal to the sum of the power requirements of the Companies therefrom.

Consistent with section 3.02 of the agreement, construction of Plant 2 was carried out by the three utilities under the day-to-day supervision and direction of WPS, which in turn was supervised by the construction committee consisting of representatives of each utility. It is the common practice of the utility industry to control and direct the management of new plant construction rather than to purchase a completed plant from a contractor.

Consistent with section 3.05 of the agreement, construction contracts for the plant were entered into which provided for performance for the account of each utility. Charges were billed to and paid by the utilities in proportion to their respective interests. Invoices for such billing were submitted in the names of all three utilities.

Consistent with section 3.06 of the agreement, WPS, as agent, maintained books and records for the construction of Plant 2 and maintains records for operation and maintenance. These records were, and are, open to examination at any time by WPL and petitioner. WPS is required to and has provided WPL and petitioner with summaries or counterparts to satisfy all applicable regulatory requirements of the individual utilities.

In accordance with section 3.07 of the agreement, expenditures for Plant 2 were accounted for under the Uniform System of Accounts of the PSC and of the FERC. Petitioner has paid and pays its portion of all expenditures for licensing, construction, operation, and maintenance and repair of Plant 2. Property taxes attributable to petitioner's ownership of Plant 2 are billed to and paid for by petitioner. Petitioner has borne its share of sales and use taxes attributable to the construction of Plant 2. Depreciation and amortization rates and interest charged to construction were computed and accounted for separately by petitioner and each other utility as required by the PSC.

Pursuant to section 3.08 of the agreement, a special bank

account in the names of the three utilities was maintained to which each utility contributed funds for its portion of the construction cost of Plant 2.

Consistent with section 3.10 of the agreement, an operating committee with all three cotenants represented was created to establish general policies for the operation and maintenance of Plant 2. Consistent with section 3.10 of the agreement, WPS operates and maintains Plant 2 for all three utilities in accordance with good utility operating practices under the general policies established by the operating committee. WPS utilizes its own employees and is otherwise responsible for the generation of power as economically as possible for transmission to the cotenants.

The employees used to operate Plant 2 are WPS employees. WPS pays social security and workmen's compensation for these employees as it does for all its employees. Furthermore, WPS withholds State and Federal taxes for them, provides them with all of its usual employee fringe benefits, and also includes them in its pension plans. They are treated in the same manner as all other WPS employees. During the years in issue, WPS did not own, solely, or in conjunction with any other utility, any other nuclear power plants. None of the personnel used to operate Plant 2 were employees of petitioner, WPL, or any arrangement of the cotenants.

As required by section 3.12 of the agreement, title to all property was at all times and is in the names of the three utilities as tenants-in-common with undivided interests in proportion to ownership. Construction, acquisitions, and purchases were and are made in such manner that title vests in accordance with the foregoing. On February 2, 1967, petitioner, WPS, and WPL executed an agreement entitled "Mutual Assignment of Options, Contract Rights and Other Properties," mutually assigning any and all property rights owned or thereafter acquired in connection with Plant 2 to one another as tenants-in-common with undivided interests therein.

The amounts paid by petitioner and each other cotenant in connection with Plant 2 exactly equals the expenses for which that cotenant is liable. If petitioner then sells the electricity received by it, the revenues generated will contribute to petitioner's individual profits. None of the other cotenants,

however, would have any interest in a share of the revenue or income received or the profit made by petitioner.

It was the intention of the cotenants that they create only a cotenancy and not a partnership and that they be taxed as cotenants and not partners. To that end, WPS filed a Federal partnership return, Form 1065, and an election out of the provisions of subchapter K of the Internal Revenue Code of 1954.[1]

On March 22, 1967, WPS, WPL, and petitioner simultaneously filed an application with the PSC for a certificate of authority to construct and place in operation Plant 2. The participation of petitioner and each of the other utilities was required to be considered individually by the PSC in terms of each utility's available generating capacity, customer demand, financial capability, the potential effect on each utility's individual rate structure, and the compatibility of the participation with the overall planning for the State of Wisconsin. Effectively, the PSC has the authority to forbid new construction by a utility.

On October 18, 1967, after public hearing, the PSC authorized petitioner's participation in the construction and placing in operation of Plant 2, conditional upon the NRC (then the Atomic Energy Commission) approval and licensing, a long-term fuel procurement agreement, and satisfaction of various safety requirements. Without the certificate of authority, it would have been impossible for petitioner to build Plant 2.

Site preparation for Plant 2 began in November of 1967. The major contracts covering the acquisition and construction of the basic nuclear plant and essential accessories were entered into between February and July of 1968. On August 18, 1967, the three utilities simultaneously applied to the NRC for a construction permit and operating license for Plant 2. Various amendments thereto were subsequently filed. On August 6, 1968, the NRC issued an order and provisional construction plant permit after finding that the proposed facility was similar in design to plants previously approved by the NRC and that there was a reasonable assurance that the proposed facility could be constructed and operated at the proposed site without undue risk to the health and safety of the public.

---

[1]Except as otherwise indicated, all Code references are to the Internal Revenue Code of 1954.

The final safety analysis report as required by the provisional construction permit was simultaneously filed by the three utilities on February 1, 1971, with the NRC. In order to obtain a plant operating license, petitioner, WPS, and WPL had to demonstrate to the NRC that the facility was essentially constructed as described in the final safety analysis report.

Under 10 C.F.R. sec. 50.23, a provisional construction permit "will be converted upon due completion of the facility" into an operating license. 10 C.F.R. sec. 50.50 provides that upon completion of construction in compliance with the terms and conditions of the provisional construction permit and subject to any necessary testing for health and safety purposes, the NRC "will, in the absence of good cause shown to the contrary, issue an operating license." Under part 3 of the provisional construction permit, the required operating license would be issued when the applicants submitted the complete final safety analysis report; the commission found that the final design satisfied health and safety requirements; and the applicants sought and obtained required insurance protection. These conditions were solely within the control of the utilities and were satisfied as a matter of course in the construction of the facility by the utilities. Compliance with existing and newly promulgated safety factors is only a question of additional cost for the facility, as is the liability insurance. As of March 23, 1978, the NRC has never denied an operating license upon completion of a facility under the authority of the provisional construction permit.

Plant 2 was scheduled for completion by March 1, 1972, at an estimated cost to petitioner of $14,770,000, exclusive of fuel. This cost to petitioner was revised to approximately $20,463,000 at the time the NRC provisional construction permit was granted. The scheduled completion date was subsequently extended to December 31, 1972, and then to August 31, 1973. A facility operating license was issued to the three utilities by the NRC on December 21, 1973, and the plant was completed and fuel loaded in 1973. The eventual construction cost of Plant 2 capitalized on petitioner's books (based on petitioner's interest) was approximately $37,142,500. The reasons for delays in the construction of Plant 2 and the commensurate increases in cost were primarily attributable to additional or revised NRC safety requirements,

skilled labor shortages, and late delivery of critical parts and components.

Although petitioner's analysis of the best way to satisfy its customer demand led it to construct a nuclear facility, Plant 2, this facility differed from Plant 1 only in the method used to heat water for steam production and in the equipment used to store and handle the fuel. However, the construction, the safety requirements, and the environmental requirements differ because of the type of fuel. There is no difference in the end product of the generating process, the electricity, and there is no difference in the transformers, power lines, and other devices used in transmission and distribution of electricity produced by a nuclear plant. Petitioner's portion of the electricity generated by Plant 2 simply becomes part of all the other electricty flowing through petitioner's own distribution and transmission system.

Under the PSC and the FERC mandated utility accounting, petitioner is required to and does account for its interest in Plant 2 in the same manner as it accounts for its other plant and equipment. Petitioner's interest in Plant 2 and each of the assets used in the operation of Plant 2 are listed in reports to the PSC, FERC, Securities and Exchange Commission, shareholders, and in its mortgage indentures with all of its other assets related to the electric part of its business, as "Electric Plant." Neither petitioner's books, balance sheet, nor any of the above-listed reports indicated that petitioner had any asset which could be considered an "investment" in Plant 2.

Petitioner is required, under mandated utility accounting, to account for its portion of the expenses associated with Plant 2. These expenses are combined with and treated in the same manner as the expenses from petitioner's other generating facilities. Petitioner is entitled to and takes and sells or uses its portion of the electricity generated by Plant 2. The electricity is distributed individually by petitioner through its own network to its own customers in the same manner as electricity generated by any other plant owned by petitioner.

The PSC, in determining petitioner's rate base for settling rates which petitioner may charge its customers for electricity, includes petitioner's interest as a tenant-in-common in Plant 2 and the assets used to operate Plant 2 along with its other assets. Petitioner's portion of expenses with respect to Plant 2 is similarly treated in determining the rate of return petitioner

will be allowed to earn on its invested capital and, hence, what rates it may charge its customers. There is no separate rate structure which is applied by the PSC to electricity generated by Plant 2 and subsequently sold by petitioner or the other utility owners.

No income has been received by Plant 2, itself; it does not sell electricity or any other product or service to anyone. Plant 2 is not recognized as a separate utility by the PSC or the FERC in the exercise of regulatory authority and therefore under present law and regulations it may not legally make sales of electricity. The ownership and operation of Plant 2 by petitioner, WPS, and WPL is regarded as a tenancy-in-common by the PSC and the FERC.

For its 1969 and 1970 taxable years, petitioner did not deduct on its tax returns certain expenses incurred by it during 1969 and 1970 in connection with Plant 2. These expenses relate to training of WPS employees, the establishment of internal procedures and guidelines for plant operation and maintenance (procedures), employee hiring activities, nuclear fuel management, environmental activities, and the purchase of certain spare parts. Petitioner had to incur these expenses in order to carry out its Plant 2 activities.

Petitioner expended $22,461.10 in 1969 and $100,343.24 in 1970 on training personnel for Plant 2. These training expenses consisted of instructional services and courses, WPS payroll, and travel, plus moving expenses incurred in selecting Plant 2 personnel.

Specifically, the training expenses paid for the following:

(a) Enrollment fees for a variety of nuclear physics and related orientation courses. Forty-eight WPS employees attended basic nuclear and reactor physics and mathematics courses at Northeast Wisconsin Technical Institute in Green Bay, which were conducted by two WPS nuclear engineers. Ten WPS employees were enrolled in similar courses at Manitowoc Vocational Institute and 16 at Northcentral Technical Institute in Wausau. These courses were given to provide nuclear orientation and background for WPS employees considering working at Plant 2. In addition, four WPS employees took a University of Wisconsin extension correspondence course in nuclear engineering, one WPS employee attended a 3-day pipewelding seminar,

one WPS employee attended a 5-day maintenance seminar, and one WPS employee attended a nuclear insurance workshop.

(b) Payments to NUS Corp. for a nuclear power training course attended by 15 WPS employees and a research reactor training course attended by 12 WPS employees. NUS Corp. also presented an operator orientation program attended by 20 WPS employees. These courses were presented at WPS offices in Green Bay and at the University of Wisconsin research reactor in Madison and at the Plant 2 site.

(c) Westinghouse's charges for training 12 reactor operator candidates at Westinghouse's reactor in Saxton, Pa. Operator training is discussed in greater detail in subsequent paragraphs.

(d) The salaries of WPS employees while undergoing training.

(e) The reimbursed travel and related expenses of WPS employees undergoing training away from Green Bay, such as at the Westinghouse facility in Saxton.

(f) The cost of various manuals, outlines, and notebooks and note paper used in training which were furnished without charge to WPS employees.

(g) Gas, oil, and minor repairs for WPS automobiles assigned to the WPS training group.

(h) The cost of a program in maintenance conducted by Douglas United Nuclear in Hanford, Wash., which was attended by two WPS employees.

(i) A bookkeeping allocation of WPS purchasing department overhead for that department's work in reviewing invoices, contracts, and similar functions relating to training charges.

Training employees to operate and maintain petitioner's electric plants is an ongoing function of the electric generation process in order to prevent unnecessary breakdowns and to assure safety of operation. Under 10 C.F.R. sec. 55, the NRC requires that most personnel working at nuclear plants be specially trained, and, in the case of operating personnel, it requires that reactor operators (RO's) and supervisors (SRO's) be licensed as competent to operate a specific nuclear facility. RO's and SRO's are referred to herein collectively as operators.

The RO license is a technician level license for which the applicant must pass a written examination and an operating test for the reactor. The SRO license applicant must pass a written examination and an operating test and must further demonstrate an ability to direct licensed RO's in a competent manner.

Details of courses of instruction, the number of course hours the applicant has completed, the number of hours of training, and the nature of the training received must be furnished to the NRC. Prior to substantial completion of a nuclear plant, operational aspects of the training are accomplished by use of a control simulator, which is a control panel mockup connected to a computer program which provides a simulation of reactor operational and emergency conditions. Additional training is achieved through inspection of the installation of various components during construction.

A nuclear plant operator is required to understand operations of a steam plant, including conventional activities such as the operation and functions of a turbogenerator. Petitioner's turbine and switchboard operators at Plant 1 have had such training. Approximately 25 percent of the total training period is devoted to conventional activities of steam generation. In addition, an operator must be trained in reactor operations, reactor physics, nuclear health physics, and core loading and unloading techniques.

Operators who pass the licensing tests are issued a license which expires in 2 years. Relicensing is then required; it entails successful completion of a written examination. A score of less than 80 percent, but greater than 70 percent on the examination, requires accelerated on-the-job retraining. A score of less than 70 percent also requires accelerated retraining, but the operator is not allowed to perform his function pending successful completion of the accelerated retraining.

In order to keep operators qualified for their positions, a continuous retraining program is required by the NRC. Retraining does not qualify personnel for promotions or new positions. Approximately one-seventh of an operator's time at Plant 2 is devoted to retraining. The scope and content of retraining is the same as that of the initial training.

The turnover of operators is high because of an extremely competitive job market and because of physical and psychological problems resulting from the pressures of the position. An adequate reserve of trained operators is required at all times and new operators must be trained continually. There are no employment contracts covering RO's and SRO's. Such training and retraining is needed to continue the operation of Plant 2.

In 1978, there were 11 licensed RO's and 13 licensed SRO's at

Plant 2. Of new employees hired for training since 1967, 13 had some previous nuclear background, primarily from U.S. Government service. Of the people selected for training, three employees did not successfully complete the program and seven trained RO's or SRO's have left the employment of WPS or have failed to requalify through 1977. Of total training expenditures incurred since 1967, approximately 34 percent is attributable to personnel who are no longer employed by WPS or are not using the training at Plant 2 as a result of their present job classifications.

Under the NRC 2-year relicensing requirement, substantial retraining of operators was required before completion of Plant 2 because of construction delays. Approximately 6.5 percent of total training expenditures are attributable to retraining during construction.

In years prior to 1969, petitioner had, on a continuing basis, trained operators for Plant 1. These training expenses have been consistently deducted for Federal income tax purposes and have never been denied as a deduction by respondent.

Petitioner also failed to deduct on its returns expenditures related to the development of procedures for Plant 2 in the amounts of $346.74 for 1969 and $640.84 for 1970. Procedures are written guidelines and instructions for the operation, repair, and maintenance of a plant. The expenditures cover petitioner's portion of WPS salaries, expenses, and overhead associated with the establishment of the procedures.

Procedures are regularly developed and prepared by utility companies, sometimes with the assistance of outside consultants, for generating facilities, and are subject to continuing review and revision based upon experience and technological developments. Petitioner has regularly deducted the cost of developing procedures in prior years for book, tax, and regulatory agency purposes, and such deductions have never been disallowed by respondent. Procedures for nuclear facilities vary from procedures for fossil fuel plants only by reason of the technological complexity of a nuclear plant and NRC mandated safety requirements.

Procedures for Plant 2 include administrative control directives, operating, surveillance, maintenance, instrument control, radiochemistry, and health physics procedures for the plant. Procedures reflect the conditions that exist at the time they are

drafted. Such conditions include the technical information available, industry experience, attitude and experiences of the authors, and for a new type of plant, assumptions regarding the behavior of plant components.

Based upon the Kewaunee Plant Technical Specifications, the final safety analysis report and Standard 18.7 of the American National Standards Institute, systematic review of procedures is made as required. The frequency of such review varies from plant system to plant system, depending on the complexity of the particular operation involved and the operation maturity of the plant. Applicable procedures must be reviewed following an unusual incident, an unexpected voltage surge, significant operational error, equipment malfunction, or any modification of a system or operation. In addition, it is required that all Plant 2 normal and emergency integrated plant operating procedures be reviewed at least every 2 years. During the initial years of plant operation, key safety procedures were reviewed at least yearly. A change in any one procedure usually requires changes in related procedures. Sixty-eight percent of the procedures for Plant 2 have been revised, some as many as 15 times.

Petitioner also incurred expenditures of $161.37 in 1969 and $1,705.77 in 1970 relating to the hiring and recruiting of plant staff, including required medical examinations and employee moving costs. Regular medical examinations are required for all Plant 2 personnel. Similar expenditures have arisen in the normal operation of Plant 1 and other plants. They have been deducted for book and tax purposes by petitioner in past years and such deductions were not questioned by respondent.

Petitioner also incurred expenditures in 1969 of $9,932.23 and in 1970 of $10,516.60, which were classified as nuclear fuel management expenses. Charges to this account represent WPS salaries, expenses and overhead, and payments to outside consultants incurred in developing a method for and analyzing the performance characteristics of fuel assemblies. There are 121 individual assemblies with varying predicted consumption rates and other physics characteristics in each core. Typically, Plant 2 is shut down each year and one-third of the fuel assemblies are replaced. Based upon new analyses, the fuel assemblies are then arranged so as to again produce optimal efficiency consistent with safety parameters. The analysis takes place on a continuing basis, with predictions being compared to actual measurements.

In 1970, petitioner expended the amount of $28.60 as its cost of a spare part. This was a spare vacuum pump for air sampling equipment used in required monitoring of the construction site. In 1969 and 1970, petitioner also incurred expenditures of $62.43 and $222.52, respectively, for WPS salaries relating to environmental and ecological activities and for electricity for remote air samplers. These expenditures are attributable to required air sampling in the vicinity of the Plant 2 construction site.

Pursuant to orders of the PSC, petitioner was required to amortize training expenses, net of income taxes over a 60-month period from the date of commercial operation of Plant 2, a date occurring after the years in issue, and the other nonconstruction expenses associated with Plant 2, net of income taxes, over a 3-year period beginning January 1, 1973.

During the calendar years 1968 and 1969, petitioner made a deductible charitable contribution of two parcels of real estate, consisting of approximately 24 acres, which were located within the city of Madison, Dane County, Wis., to the Madison Gas & Electric Foundation (hereinafter the foundation). A portion of the land was contributed on September 6, 1968. This parcel was approximately 508,694 square feet in size. The remaining portion of the property was contributed on March 20, 1969, and was approximately 533,871 square feet in size.[2] At the time of its transfer to the foundation, each of these parcels was zoned M-1 under the Madison zoning ordinances.

The donated property is located approximately 2 miles northeast of the center of downtown Madison. The area surrounding the donated property consists of older residences, new apartments, some commercial property and office buildings, and older industrial development. The property adjoins the Yahara Parkway. In 1968 and 1969 the property was vacant. It had been used by petitioner for storage of coal, electric power poles, and gasline pipe. The property borders on Fordem Avenue for about 1,350 feet and has 510 feet along East Johnson Street. The property is irregular in shape but has a minimum depth to the Yahara River bank setback line of 300 feet. Much of the property has a depth of 625 feet. The area around the property

---

[2] The stipulation states the size of the parcels to be 254,500 and 293,630 sq. ft. It is clear from the stipulated facts that the two parcels consisted of approximately 24 acres. An acre is 43,560 sq. ft. Therefore, 24 acres is 1,045,440 sq. ft. This fact, as well as the balance of the record, shows that the stipulation of the parties as to the square footage of each parcel is in error.

was at one time marshland which connected Lake Mendota and Lake Monona. Some drainage had been done on the surrounding property. The property directly across the Yahara River from the donated property is Tenney Park. At one time, the Tenney Park site had been the City of Madison's dump. However, prior to 1968, this property had been drained and built up, a lagoon had been made in the property, and it had been developed into a park area. Over the years, the donated property had received miscellaneous fill from petitioner's coal-fired power plants. However, the M-1 zoning had been placed on the property by the City of Madison Planning Commission because of the extensive soil preparation considered to be necessary to support medium or high density residential structures. A spur railroad track was located through the property parallel to Fordem Avenue. Access to the interstate freeway system was convenient to the site over East Johnson Street and Highway 113. Public bus transportation was also available on East Johnson Street.

Shortly after the transfer of the second parcel to the foundation in late March 1969, the foundation began to receive offers for purchase of the property.

In May of 1969, a group was interested in purchasing the combined properties for $380,000, subject to deferred payment. Negotiations with this group continued until May 21, 1971, when the group was informed that the price it was willing to pay for the property was entirely inadequate. Between May and August of 1969, Mr. Ken Opitz, on behalf of a group of investors, first offered to trade another parcel of real estate and then offered to pay $350,000 cash for the donated property. Mr. Opitz had previously valued the land for the Foundation at between $320,000 and $630,000. At some time between November 1969 and March of 1970, Mr. Opitz offered, on behalf of Wisconsin Residences, Inc., to pay $420,000 for the property on a 10-year land contract basis. The foundation turned down this offer.

The following schedule shows certain sales of apartment sites in Madison, Wis., on the dates and at the prices indicated, together with the size of the site, number of units erected, price per dwelling unit, and price per acre:

548

| | Location | Date of sale | Price of site | Number units erected | Size of parcel (acres) | Price per dwelling unit | Price per acre |
|---|---|---|---|---|---|---|---|
| (1) | Pheasant Lane, Middleton, Lake View Manor | 1/67 | $100,000 | 120 | 9.08 | 833 | $11,100 |
| (2) | Huy Q & M Ct., Middleton | 3/68 | 350,000 | 350 | 17.66 | 1,000 | 19,800 |
| (3) | Simpson and Frazier Ave. South Side Madison | 7/68 | 110,000 | NA | 10 | Not available | 10,000 |
| (4) | 2522 to 2550 So. Stoughton Rd. | 7/68 | 78,000 | 93 | 5.45 | 839 | 14,300 |
| (5) | 1502 — 66 Troy Dr. North Glen Apts. | 12/69 | 130,000 | 128 | 7.126 | 1,015 | 18,243 |
| (6) | Gammon Rd. Middleton | 2/70 | 170,000 | 144 | 10 | 1,180 | 17,000 |
| (7) | Mineral Point Rd. west of Gammon Rd. | 5/71 | 200,000 | 270 erected 540 zoned | 28.25 | 370 | 7,100 |
| (8) | Sheboygan and Eau Claire Aves. | 6/71 | 250,000 | 172 | 3.585 | 1,450 | 69,735 |
| (9) | 501 Northport Dr. | 10/71 | 140,000 | 128 | 8.03 | 1,094 | 17,435 |
| (10) | Gammon Rd.—North of Mineral Point Rd. | 12/71 | 383,000 | 246 | 208 | 1,550 | 18,400 |
| (11) | 3620 Breckenridge Ct. | 10/71 | 185,000 | 204 | 15 | 900 | 15,400 |
| (12) | 2400 W. Independence Lane | 11/72 | 400,000 | 337 | 14 | 1,187 | 28,600 |
| (13) | Swanton Rd. — near Milwaukee St. | 12/72 | 135,000 | 190 | 10.96 | 710 | 12,300 |
| (14) | 602 E. Johnson St.[1] | 4/74 | 192,000 | 192 | 6.289 | 1,000 | 30,530 |

[1]This was a resale of a portion of the donated property. The number of units which could be erected on the approximately 24 acres of donated property is 772.

The following schedule shows certain sales of industrial sites in Madison, Wis., together with the price, square footage of parcel, and price per square foot:

| | | Date of sale | Price | Square feet | Dollars per sq. ft. |
|---|---|---|---|---|---|
| 1. | MATC | 6/8/67 | $108,750 | 152,460 | 0.71 |
| 2. | MATC | 1/23/67 | 75,000 | 81,828 | 0.92 |
| 3. | Gorman | 12/20/65 | 17,500 | 21,060 | 0.83 |
| 4. | Holfman | 6/5/64 | 15,000 | 17,050 | 0.88 |
| 5. | Garrett | 5/31/63 | 12,000 | 13,932 | 0.86 |
| 6. | Madison Transit | 1/4/68 | 55,000 | 211,701 | 0.26 |
| 7. | Madison Trust | 12/28/66 | 45,000 | 67,900 | 0.66 |
| 8. | NW Mutual | 9/9/66 | 117,500 | 138.521 | 0.85 |

In 1971 or 1972, the Federal Government returned Truax Field to the City of Madison with covenants which guaranteed that the land would be developed for aircraft-related industries. When the city placed the Truax land on the market, the price of commercial real estate in Madison declined.

The foundation was established for charitable, scientific, literary, and educational purposes, and carries out those objectives by granting scholarships and making contributions to

various statewide and local charities. Until February 9, 1973, the foundation's major asset was the donated property.

The foundation sold the property on February 9, 1973, for $468,300. At the time of the sale, the property was not income-producing and the foundation was incurring a real estate tax liability as the result of owning the property. Prior to the sale, the property was rezoned for multifamily residential. The purchasers constructed apartments on the property. Preparing the land for apartment construction cost the purchasers approximately $200,000.

Petitioner, on its 1969 and 1970 Federal income tax returns in an attached schedule explaining its other deductions, used a method for expensing the cost of coal consumed as boiler fuel based on the computation of cost of coal consumed as set forth in our findings. On the basis of this computation, petitioner deducted $3,402,670 and $4,273,659, respectively, as cost of coal consumed in 1969 and 1970. Respondent, in his notice of deficiency, decreased these deductions with the following explanation:

It is determined that you are not entitled to use a last-in, first-out method of accounting for the cost of coal consumption or any variation of such method. Therefore, it is further determined that your taxable income is recomputed by using a first-in, first-out method for valuation of coal on hand pursuant to the provisions of Sec. 481 of the Internal Revenue Code. Accordingly, your taxable income is increased for the taxable years 1969 and 1970 in the respective amounts of $92,952.80 and $84,743.53, as computed below.

| | 1953 | 1968 | 1969 | 1970 |
|---|---|---|---|---|
| Coal on hand Dec. 31—FIFO basis ....... | $250,486.79 | $361,505.43 | $644,679.20 | $1,021,844.50 |
| Coal on hand Dec. 31—LIFO basis ....... | 215,938.80 | 294,326.99 | 517,178.41 | 809,600.18 |
| Increase in cost of coal on hand Dec. 31 ...................................... | 34,547.99 | 67,178.44 | 127,500.79 | 212,244.32 |
| Increase in cost of coal on hand Jan. 1 ............................. | | | (67,178.44) | (127,500.79) |
| Current year increased ........:............. | | | 60,322.35 | 84,743.53 |
| Adjustment to prevent omission— sec. 481(a)(2) ............................... | | | 67,178.44 | |
| Adjustment to eliminate pre-1954 balance—sec. 481(a)(4) ................ | | | (34,547.99) | |
| Increases to taxable income ................. | | | 92,952.80 | 84,743.53 |

Petitioner, on its 1968 and 1969 Federal income tax returns in an attached schedule explaining its contributions, took a deduction for the value of the two parcels it donated to the foundation of $225,000 and $200,000, respectively. Respondent, in his notice

of deficiency, decreased the value of the 1969 contributions with the following explanation:

It is determined that the combined fair market value of the two adjoining parcels of land known as Yahara property donated to Madison Gas and Electric Foundation in 1968 and 1969 was $350,000 rather than $425,000 ($225,000 for 1968 and $200,000 for 1969) claimed on your income tax returns. Accordingly, your taxable income for 1969 is decreased by $2,811.03 and for 1970 is increased by $73,075.12, as computed below.

|  | 1969 |
|---|---|
| Current contributions per return | $228,965.65 |
| Carryover from 1968 per return | 58,117.48 |
| Increased carryover due to adjustments to 1968 income | 4,735.91 |
| Total available before adjustment | 291,819.04 |
| Less: Decrease in fair market value of donated land | (75,000.00) |
| Contribution deduction allowable | 216,819.04 |
| Amount claimed | 214,008.01 |
| Decrease to income | (2,811.03) |
|  | 1970 |
| Current contributions per return | 17,553.52 |
| Allowable carryover | None |
| Contribution deduction allowable | 17,553.52 |
| Amount claimed | 90,628.64 |
| Increase to income | 73,075.12 |

In its petition, petitioner alleged that the value of the two donated parcels at the date of the gifts in 1968 and 1969 were $310,000 and $320,000, respectively, and on brief claimed the respective values were $255,000 and $295,000.

As heretofore stated, petitioner did not deduct training expenses, salary and related expenses, and spare parts in connection with the nuclear plant on its tax returns for 1969 and 1970, but by amendment to petition, claimed a deduction for these years for these expenses in the total amounts of $33,418.45 and $114,434.27, respectively.

OPINION

Both parties recognize that the cost of petitioner's coal is deductible under section 162 as an ordinary and necessary expense paid or incurred in carrying on a trade or business. Also, the parties agree that the coal used by petitioner is a material

used in its business, the cost of which is determinable in accordance with section 1.162–3, Income Tax Regs.[3] The parties likewise agree that, even though petitioner had at the beginning and end of each year here in issue and for many years prior thereto a physical inventory of coal, its coal was not "acquired for sale" nor was it a material "which will physically become a part of merchandise intended for sale." For this reason, the coal was not includable in petitioner's inventory under section 471 and section 1.471–1, Income Tax Regs.[4] And, the parties agree that under section 1.162–3, Income Tax Regs., inventories of materials and supplies are not generally used. Yet their use, apart from the inventory of finished goods, goods in process, or materials and supplies held for sale or to become a physical part of merchandise intended for sale, might be permissible if such use would clearly reflect the taxpayer's cost of material consumed. See *Smith Leasing Co. v. Commissioner*, 43 T.C. 37, 40 (1964).

Respondent, in his notice of deficiency, determined that petitioner was not entitled to use a "last-in, first-out method of accounting for the cost of coal consumption or any variation of

---

[3]Sec. 1.162–3, Income Tax Regs., reads as follows:

Sec. 1.162–3 Cost of materials.

Taxpayers carrying materials and supplies on hand should include in expenses the charges for materials and supplies only in the amount that they are actually consumed and used in operation during the taxable year for which the return is made, provided that the costs of such materials and supplies have not been deducted in determining the net income or loss or taxable income for any previous year. If a taxpayer carries incidental materials or supplies on hand for which no record of consumption is kept or of which physical inventories at the beginning and end of the year are not taken, it will be permissible for the taxpayer to include in his expenses and to deduct from gross income the total cost of such supplies and materials as were purchased during the taxable year for which the return is made, provided the taxable income is clearly reflected by this method.

See Rev. Rul. 75–407, 1975–2 C.B. 196, 197.

[4]Sec. 471 provides:

SEC. 471. GENERAL RULE FOR INVENTORIES.

Whenever in the opinion of the Secretary or his delegate the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary or his delegate may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

Sec. 1.471–1, Income Tax Regs., provides in part:

Sec. 1.471–1 Need for inventories.

In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. The inventory should include all finished or partly finished goods and, in the case of raw materials and supplies, only those which have been acquired for sale or which will physically become a part of merchandise intended for sale, in which class fall containers, such as kegs, bottles, and cases, whether returnable or not, if title thereto will pass to the purchaser of the product to be sold therein. * * *

such method." Respondent recomputed petitioner's taxable income "by using a first-in, first-out method for valuation of coal on hand."

While respondent does not specifically argue on brief that petitioner uses a "last-in, first-out" method of computing cost of coal consumed, he in effect made such a determination in his notice of deficiency. Petitioner argues that its method is not a "last-in, first-out" method, but is a method of computing the cost of materials only in the amount actually consumed during the taxable year as required by section 1.162–3, Income Tax Regs. We agree with petitioner that its method of computing cost of coal consumed is not technically a "last-in, first-out" method.

The stipulated facts are clear that petitioner consumed the coal actually received on any particular day when daily deliveries were made to its plant, and consumed the coal actually received in each shipment before the next delivery when coal was delivered 3 or 4 times a week, except on the rare occasion when the coal delivered did not match its needs.[5] If the coal received on any date exceeded petitioner's coal consumption before the next delivery, the excess was added to the edge of petitioner's newest reserve pile of coal. On the rare day when the coal received did not fulfill petitioner's needs before the next

---

[5]In making this statement, we rely on the following stipulated facts:

"During the years in issue, and even in more recent years, the deliveries of coal to Plant 1 were less frequent than they had been in the past. Coal was delivered to the Plant several times each week and the size of the shipments increased. Usually, the coal in a given shipment was no longer consumed totally on the day of delivery. However, *coal delivered during one shipment was generally consumed before the delivery of the next shipment.* In fact, the railroad cars used to deliver the coal often stayed at Plant 1 two or three days so that the coal could be unloaded directly from the cars into the bunker above the boilers where it would be used almost immediately. The Reserve Piles of coal continued to be maintained. *Although the situation rarely arose,* Petitioner still followed the practice of taking any excess coal not consumed by the time the next delivery occurred and putting it on the edge of the most recently established Reserve Pile. Also continued was the Petitioner's practice of removing coal from the edge of the most recently established Reserve Pile *if an unusual situation arose and extra coal was needed.* The Reserve Piles are not and are still not used as working piles from which coal is taken or to which coal is added on a daily or even weekly or monthly basis. [Emphasis supplied.]

"Several of the piles of coal which were maintained by the Petitioner during the years in issue had not had coal added to or taken from them for many years."

We have difficulty reconciling these stipulations with the stipulated figures of coal purchased and coal consumed in the years 1968 and 1969. We also have difficulty reconciling the stipulated average cost per ton of coal paid by petitioner in the years 1968 and 1969 with the total cost of coal consumed by petitioner based on the stipulated method used by petitioner in computing cost of coal consumed. However, since the facts in this case with respect to this issue have been fully stipulated, we have in our findings and in our opinion accepted these stipulated facts as to consumption of coal and method of computation of cost of coal consumed as true.

delivery, petitioner took the additional coal it needed from the edge of the newest reserve pile. Because the coal actually consumed by petitioner was the last coal delivered, and because petitioner as a general rule used the average cost of the coal purchased each month as its cost of coal for the month in computing taxable income, its method of accounting for the cost of coal resembles a "last-in, first-out" accounting method. This, however, is a coincidence occurring because of the manner in which petitioner used its coal.

Petitioner's method is not an inventory valuation method which entails an assumption that of items in inventory, the last received (last-in) is the first used (first-out). In fact, as both parties agree, inventories are not generally used by taxpayers in computing the cost of materials consumed, but rather the cost computed should properly be the actual cost of the materials consumed. Sec. 1.162–3, Income Tax Regs. We are concerned with the proper computation of the actual cost of the coal consumed by petitioner. However, regardless of the terminology applied to petitioner's method of computing its cost of coal consumed, respondent's change in that method must be approved unless petitioner's method clearly reflects income.

Section 446[6] provides that taxable income shall be computed under the method of accounting regularly used by the taxpayer in computing his income and keeping his books with the exception that if no regular method has been used by the taxpayer or if "the method used does not clearly reflect income" the computation shall be made under such method as, in the opinion of the Commissioner, does clearly reflect income. As is clear from section 1.446–1, Income Tax Regs., the term "method of accounting" includes not only the taxpayer's overall method but also "the accounting treatment of any item."

The parties agree that petitioner did have a method of accounting for coal consumed and have stipulated that the method petitioner used complies with "generally accepted

---

[6]Sec. 446(a) and (b) provides as follows:

SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

accounting principles for financial accounting purposes." The parties also stipulated that the PSC, which set the rates petitioner was allowed to charge, after considering all of petitioner's operating expenses "specifically required * * * petitioner to use this method [the method actually used by petitioner] of accounting for coal." And, the parties stipulated that petitioner had used the method for computing the cost of coal consumed, which it used in the years here in issue, since 1953, and it appears from the record that petitioner had used this method since before 1913, when the income tax laws became effective. In view of the stipulated facts and in light of the many cases dealing with the Commissioner's authority under section 446, the issue becomes whether petitioner's method of accounting for cost of coal consumed clearly reflects petitioner's income so that respondent was arbitrary and abused his discretion in determining that petitioner's method should be changed.

As was pointed out by the Supreme Court in *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522 (1979), affg. 64 T.C. 154 (1975):

In construing sec. 446 and its predecessors, the Court has held that "[t]he Commissioner has broad powers in determining whether accounting methods used by a taxpayer clearly reflect income." *Commissioner v. Hansen*, 360 U.S. 446, 467 (1959) [Ct. D. 1838, 1959–2 C.B. 460]. Since the Commissioner has "[m]uch latitude for discretion," his interpretation of the statute's clear-reflection standard "should not be interfered with unless clearly unlawful." *Lucas v. American Code Co.*, 280 U.S. 445, 449 (1930) [Ct. D. 168, IX–1 C.B. 314]. To the same effect are *United States v. Catto*, 384 U.S. 102, 114 (1966) [Ct. D. 1908, 1966–2 C.B. 198]; *Schlude v. Commissioner*, 372 U.S. 128, 133–134 (1963) [Ct. D. 1879, 1963–1 C.B. 99]; *American Automobile Assn. v. United States*, 367 U.S. 687, 697–698 (1961) [Ct. D. 1865, 1961–2 C.B. 245]; *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 189–190 (1957) [Ct. D. 1807, 1957–1 C.B. 513]; *Brown v. Helvering*, 291 U.S. 193, 203 (1934) [Ct. D. 786, XIII–1 C.B. 223]. * * *

As noted by this Court in *Thor Power Tool Co. v. Commissioner*, 64 T.C. at 166, "Proof that the method is in accordance with generally accepted accounting principles does not prove that the method clearly reflects income under the income tax law." Also, the fact that the method has been used by a taxpayer for many years without change by respondent is not proof that the method clearly reflects income. See *Coors v. Commissioner*, 60 T.C. 368, 395 (1973), wherein we stated:

The company's argument that its method of treating these overhead costs had been long utilized and tacitly approved can be answered by saying that

consistency does not make it right. A failure to clearly reflect income over many years cannot be justified on the grounds of tenure. See *Photo-Sonics, Inc.,* 42 T.C. 926, 935 (1964), affd. 357 F.2d 656 (C.A. 9, 1966) ("An erroneous method does not become acceptable solely upon the consistent use over an extended period of time."); *Dearborn Gage Co.,* 48 T.C. 190 (1967); *Sam W. Emerson Co.,* 37 T.C. 1063 (1962); *Geometric Stamping Co.,* 26 T.C. 301 (1956); *All-Steel Equipment, Inc.,* 54 T.C. 1749 (1970), affirmed on this issue 467 F.2d 1184 (C.A. 7, 1972).

In the final analysis, whether petitioner's method clearly reflects income is primarily a question of fact. Under the facts here present, we conclude that petitioner's method does clearly reflect income. Petitioner's method closely approaches a ton-by-ton accounting for the coal placed in petitioner's furnace. Obviously, accounting for the cost of each piece of coal actually used by petitioner on a ton-by-ton basis would be impractical. In our view, the method used by petitioner is as close an approach to actual cost as is practical.

Respondent argues that whether petitioner's method of accounting clearly reflects income is answered by the holdings in two cases dealing with the evidence necessary for a taxpayer to overcome a presumption of "first-in, first-out" inventory accounting with proof of actual costs. These cases, *Ozark Mills, Inc. v. Commissioner,* 6 B.T.A. 1179 (1927) (presumption overcome), and *Marshall-Wells Co. v. Commissioner,* 75 Ct. Cl. 26, 59 F.2d 106 (1932) (presumption prevailed), involved the presumption established by the predecessors to the provisions of section 1.471–2(d), Income Tax Regs., that where articles are commingled in inventory to such an extent that they cannot be identified with invoices, the goods in inventory will "be deemed to be the goods most recently purchased," or otherwise stated, sales of goods will be considered to be from those goods earliest acquired or "first-in."

Section 1.162–3, Income Tax Regs., does not involve the same problem. It requires that petitioner expense only that coal which is actually consumed. However, insofar as the *Ozark Mills* and *Marshall-Wells Co.* cases are applicable here, the facts in the *Ozark Mills* case are more comparable to those in this case which show that petitioner used the most recently received coal and generally used each day or week only the coal received that day or week. Petitioner has within realistic boundaries shown the actual cost of the coal consumed each year; any discrepancies in the method of accounting and actual consumption are de

minimus. Cf. *Ozark Mills, Inc. v. Commissioner, supra* at 1186 (percentage error of only 1.67 percent allowable under the stringent requirements of the showing necessary to overcome the "first-in, first-out" presumption under the predecessor of section 1.471–2(d), Income Tax Regs.).

Petitioner's method of accounting, although not tagging each lump of coal as it is received and registering its use, does within the parameters of de minimus differences trace the actual consumption of coal. The last coal received is the coal first used with any excess being added to, or deficiency taken from, the most recent reserve pile edges. The excess and deficiency alterations to the reserve piles were not common and, in any event, were accounted for in petitioner's method of determining cost of its coal used. The only variations from actual consumption would be as a result of petitioner's monthly averaging of costs in combination with the movements to and from the reserve piles. Even these minor variations would in most part be worked out over a year's time so that only de minimus differences from actual consumption could occur.

Although not controlling, strengthening petitioner's position are the following facts: (1) That petitioner used its method of accounting consistently in each of the years of its existence (see *Sam W. Emerson Co. v. Commissioner*, 37 T.C. 1063, 1068 (1962)); (2) that its method is a generally accepted method of accounting (see *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 14–15 (1974), affg. a Memorandum Opinion of this Court, but see *Thor Power Tool Co. v. Commissioner, supra*); and (3) that its method is specifically required by the Wisconsin PSC and apparently approved of by the FERC and the NRC (see *Commissioner v. Idaho Power Co., supra* at 14–15;[7] see also *Fort Howard Paper Co. v. Commissioner*, 49 T.C. 275, 284 (1967); *Auburn Packing Co. v. Commissioner*, 60 T.C. 794, 798–799 (1973)).

Even though the Commissioner has broad powers in determining what accounting methods clearly reflect income (*Commissioner v. Hansen*, 360 U.S. 446, 467 (1959)), his discretion can be, and in this case has been, abused. It is to be noted that in his

[7] In *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 15 (1974), affg. a Memorandum Opinion of this Court, the Court stated:

"Nonetheless where a taxpayer's generally accepted method of accounting is made compulsory by the regulatory agency *and* that method clearly reflects income, it is almost presumptively controlling of federal income tax consequences. [Fn. ref. omitted.]"

determination he referred to a "first-in, first-out" method for "valuation of coal on hand" even though his regulation (sec. 1.471–1, Income Tax Regs.) provides that a taxpayer's inventory of raw materials includes only those intended for sale or which will physically become a part of merchandise intended for sale. Petitioner's obligation in order to clearly reflect its income was to determine in a realistic manner the cost of the coal it actually used each year in the production of electricity. This petitioner has done.

The second issue in this case involves deductions claimed by petitioner as ordinary and necessary business expenses under section 162(a) for certain training costs and other expenses paid in connection with its interest in Plant 2, the nuclear power plant.

Petitioner takes the position that the amounts paid in connection with its interest in the nuclear power plant for which it claims a deduction meet all the requirements of section 162(a) for deductible ordinary and necessary business expenses and are not capital expenditures within the meaning of section 263. Petitioner argues that these expenses were incurred in carrying on its trade or business and were not "startup costs of a new business." Petitioner's primary position is that its agreement of joint ownership of its nuclear plant with WPS and WPL does not create a partnership and that even if it does, the expenses which it paid are ordinary and necessary business expenses of the partnership.

Respondent takes the position that although the expenses which petitioner seeks to deduct would be ordinary and necessary expenses in its production of electricity if the construction of the nuclear plant were solely for use in its own business, these expenses are not deductible since they were incurred as preoperating expenses of a partnership formed through petitioner's agreement with WPS and WPL.[8] Respondent relies on *Rich-*

---

[8]In his brief, respondent explains his position as follows:

"In *York v. Commissioner*, 261 F.2d 421 (4th Cir. 1958), *rev'g* 29 T.C. 520 (1957), the taxpayer was engaged in the development, management and improvement of real estate generally but not including industrial properties. In preparation for his entering into the business of developing industrial properties, taxpayer contracted to have a survey made with respect to a particular industrial development project. The Tax Court, believing it 'readily apparent' that the trade or business of promoting and developing residential and shopping center areas was separate and apart from that of promoting and developing industrial acreage, and that taxpayer's business was restricted to the former at the time the survey was taken, concluded that the expenses incurred were

*mond Television Corp. v. United States,* 345 F.2d 901 (4th Cir. 1965), remanded on other grounds 382 U.S. 68 (1965), as support for his position that the type of expenses here involved when paid in connnection with a new entity must be capitalized and are not deductible. Without necessarily agreeing with respondent's concession as to the nature of the expenses here at issue absent the existence of a partnership, in fairness to petitioner, we accept this concession for purposes of this case.

Respondent argues that the fact that the partners have elected under section 761(a) of the Code and section 1.761–1(a)(2), Income Tax Regs., for the partnership to be excluded from the application of subchapter K of the Code is an admission that petitioner's arrangement with WPS and WPL is a partnership. Respondent argues that irrespective of this election the agreement and relationship between petitioner, WPS, and WPL creates a partnership within the meaning of section 7701(a)(2). Respondent contends that the expenses which petitioner claims to be deductible are startup costs which must be capitalized and not expenses, relying primarily on *Richmond Television Corp. v. United States, supra.*

The question on which the parties initially join issue is whether the arrangement between petitioner, WPS, and WPL creates a partnership as defined in section 7701. While we agree with petitioner that the fact that the partners elected under section 761(a) not to be subject to the provisions of subchapter K is not an admission that the arrangement is a partnership, the definitions of partnership contained in sections 761(a) and

---

not deductible under the predecessor of section 162(a). The Fourth Circuit reversed, stating that

"'the divergency between concentrated commercial development and industrial development is neither wide nor radical. Indeed, the line of demarcation between them is obscure. Taxpayer's attention to industrial land in 1952 was but the cultivation of a sector already within the compass of his field. The activity was still intramural—it could not, under the evidence, be classified as a new pursuit, apart from his general occupation. The two were one in his vocation. (at 422).'

"Thus, the determination of whether expenses are related to an existing trade or business of the taxpayer is essential. Although the taxpayer may actively be engaged in a trade or business, the startup costs or pre-operating expenses of another activity, not a part of such trade or business are not deductible under section 162(a) as they are not incurred in the carrying on of a trade or business.

"It initially appears that all additional expenses involved in the present case were expended in the conduct of Petitioner's existing trade or business, the production of electricity. Although the means of production in the case of the nuclear facility may be radically different from conventional methods, the end product, electricity, is the same.

"However, closer analysis reveals that all additional expenses claimed are in fact incurred in the initial activity of the partnership formed through Petitioner's agreement with WPS and WPL."

7701(a)(2) are the same.[9] It is therefore necessary for us to decide whether the arrangement between petitioner, WPS, and WPL is a partnership as defined by section 7701(a)(2).

It is petitioner's position that a profit motive of the partnership as an entity is a requirement of partnership status and that such a motive is lacking from the arrangement present in this case. Petitioner argues that only a coownership and expense-sharing arrangement was created from its agreement with WPS and WPL.

Petitioner notes that section 1.761–1(a), Income Tax Regs., and section 301.7701–3(a), Proced. & Admin. Regs., provide that "a joint undertaking merely to share expense is not a partnership" and that mere coownership of property is not a partnership. Petitioner also points out that these regulations provide that "Tenants in common, however, may be partners if they

---

[9]Respondent in Rev. Rul. 68–344, 1968–1 C.B. 569, concludes that a venture formed by four electrical power companies substantially similar to the arrangement here of petitioner, WPS, and WPL is properly classified as a partnership for Federal tax purposes. The ruling then proceeds to discuss the provision of sec. 761(a) and concludes that the members of the venture may elect under sec. 761(a) to have the venture excluded from the application of subch. K. The parties stipulated in this case that it was the intention of the cotenants—petitioner, WPS, and WPL—that they create only a cotenancy and not a partnership and that they be taxed as cotenants and not partners. This stipulation is followed by the stipulated statement:

"To that end WPS filed a federal partnership return, Form 1065, and an election out of the provisions of subchapter K of the Internal Revenue Code of 1954."

While petitioner denies that filing an election-out under sec. 761(a) is an admission that a partnership exists for tax purposes, it does not contend that because of this election under sec. 761(a) no partnership exists for the purposes of determining what constitutes deductible expenses under sec. 162. The clear import of petitioner's brief is that if we conclude that its arrangement with WPS and WLP is a partnership as defined in sec. 7701, then the deductibility of the expenses here involved is dependent upon whether those expenses are deductible by the partnership. Respondent makes no argument with respect to the election-out of the partnership under sec. 761(a), but merely cites his Rev. Rul. 65–118, 1965–1 C.B. 30. Respondent does not cite or discuss *Bryant v. Commissioner*, 46 T.C. 848 (1966), affd. 399 F.2d 800 (5th Cir. 1968), although in that case we in effect approved Rev. Rul. 65–118, *supra*, specifically pointing to the definition of partnership in sec. 7701(a)(2) "when used in this title" and the fact that sec. 48(c)(2)(D) (involved in the *Bryant* case and the revenue ruling) contained a specific provision with respect to limitations in the case of a partnership. We have found no case dealing with an election-out under sec. 761(a) when the controlling statute outside of subch. K makes no reference to partnerships. In texts on partnerships, we have found statements which indicate that an election-out in such a situation is not controlled by the *Bryant* decision and other indications in the same texts that it is. Compare sec. 1.05, p. 17, with sec. 31.11, p. 464, A. Willis, Partnership Taxation (2d ed. 1976). See also the statements in W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, sec. 3.05[3], p. 3–35, first and last pars. (1977).

Since petitioner here makes no contention that an election-out under sec. 761(a) causes the unincorporated group not to be a partnership except for purposes of those statutes which contain a specific reference to "partnerships," we have not considered and do not here decide such a possible issue even though a question in this respect is raised by writers of texts on partnerships and a number of law review articles dealing with partnership problems.

actively carry on a trade, business, financial operation, or venture and divide the profits thereof."[10] Petitioner relies, in support of its position of the necessity of a profit motive by the entity for partnership status, on *Cooperative Power Plant v. Commissioner*, 41 B.T.A. 1143 (1940), and *Cooperative Insurance v. Commissioner*, 41 B.T.A. 1151 (1940), in which arrangements somewhat similar to those in the instant case were held not to be associations taxable as corporations because gain was not an objective of the arrangement.[11] In our view, these cases have no bearing on whether the arrangement here involved created a partnership under the definition of section 7701(a)(2).

Petitioner argues that respondent's Rev. Rul. 68–344, 1968–1 C.B. 569, is erroneous in concluding that an arrangement similar to the one here is a partnership. The essence of petitioner's argument is that the construction and operation of the nuclear power plant in this case is equivalent to a joint undertaking to share expenses such as that described in the regulations and therefore does not constitute a partnership. Section 1.761–1(a), Income Tax Regs., and section 301.7701–3(a), Proced. & Admin. Regs., declare that "if two or more persons jointly construct a ditch merely to drain surface water from their properties, they are not partners." In our view, petitioner's arrangement with WPS and WPL is in no way comparable to the joint construction of a drainage ditch.

Prior to 1954, the following definition of a partnership for Federal tax purposes was found in section 3797(a)(2), I.R.C. 1939:

(2) PARTNERSHIP AND PARTNER.—The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through

[10]Petitioner argues that the Supreme Court in *Commissioner v. Tower*, 327 U.S. 280, 286–287 (1946), declared a community of interest in the profits and losses to generally be a requirement of partnership status.

[11]Petitioner also cites *Cooperative Power Plant v. Commissioner*, 41 B.T.A. 1143 (1940), as holding that the taxpayer's arrangement therein did not create an entity separate from that of the principals. We do not agree with this interpretation of that case. To the contrary, we read that case to implicitly hold that the arrangement therein was a partnership. The issue was whether, as determined by respondent, the arrangement was an association taxable as a corporation. The taxpayer's position was that the arrangement was a partnership or a joint venture. *Cooperative Power Plant v. Commissioner, supra* at 1148. Although the analysis of the case was on the association issue, our holding for the taxpayer implicitly upheld the taxpayer's view that the arrangement was a partnership for Federal tax purposes. Thus, relying on this holding to support the position that an entity profit motive is necessary for an unincorporated activity to be a partnership is untenable.

In addition, petitioner cites Wisconsin State law to support his view that the arrangement in this case is not a partnership. It is clear, however, that State law is in no way controlling on the question of whether an unincorporated activity is a partnership for Federal tax purposes. *Luna v. Commissioner*, 42 T.C. 1067, 1077 (1964).

or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization. * * * [12]

In the 1954 Code, this definition of partnership was unchanged and is contained in two sections, section 761(a) and section 7701(a)(2).

As petitioner points out, it has long been recognized that mere coownership of property will not create a partnership. *Estate of Appleby v. Commissioner*, 41 B.T.A. 18 (1940). In that case coowners of inherited property, at the suggestion of automotive dealers, erected a garage on the property and rented the space to defray the expenses of owning the inherited property, primarily real estate taxes. We held that the erection and renting of the garage was not a group, joint venture, or other organization within the partnership definition of the 1939 Code. Whether coownership of property gives rise to a partnership for Federal tax purposes is determined by "the degree of business activities of the coowners or their agents."[13] See *Hahn v. Commissioner*, 22 T.C. 212 (1954), which held the requisite activities not to be present. The regulations set forth this test in slightly different words and it is the wording of the regulations as interpreted by petitioner which it would have us follow in equating the construction of a drainage ditch with the construction and operation of a nuclear power plant. Section 1.761–1(a), Income Tax Regs., and section 301.7701–3(a), Proced. & Admin. Regs., as noted above, declare that "Tenants in common, however, may be partners if they actively carry on a trade, business, financial operation, or venture and divide the profits thereof." Petitioner, relying on this regulation, contends that a partnership must have a profit motive for the partnership entity and that, because petitioner received the electricity from the nuclear power plant in kind, such a profit motive did not exist in its arrangement with WPL and WPS. We do not agree.

First, the statute does not require a profit motive; rather it

---

[12]The definition was first placed in the Code by sec. 1111(a)(3) of the Revenue Act of 1932. The purpose of this provision was to broaden the Federal partnership definitions to include therein a number of arrangements that under State law were not partnerships, such as joint ventures. See S. Rept. 665, 72d Cong., 1st Sess. (1932), 1939–1 C.B. (Part 2) 496, 538.

[13]*Powell v. Commissioner*, T.C. Memo. 1967–32, 26 T.C.M. 161, 164, 36 P–H Memo T.C. par. 67,032, p. 179.

merely requires "an unincorporated organization, through or by means of which any business, financial operation, or venture is carried on." The business activity or profit motive test is important in distinguishing partnerships from the mere coownership of property. However, this test is not the only test for what constitutes a partnership for Federal tax purposes. Second, the test of business activity or profit motive for purposes of finding a Federal tax partnership is clearly met in the situation at hand where a group of business organizations decide to band together to produce with economies of scale a common product to be distributed to the members of the venture in kind. In *Bentex Oil Corp. v. Commissioner*, 20 T.C. 565, 571 (1953), we found without any extended discussion that an organization formed to extract oil under an operating agreement which called for distribution of the oil in kind was a partnership for Federal tax purposes. The agreement in the *Bentex* case was analogous to the agreement in the instant case. That an agreement such as the one here under consideration creates a partnership is implicit in the holdings in *Cooperative Power Plant v. Commissioner, supra*, and *Cooperative Insurance v. Commissioner, supra*. See n. 11 *supra*. Joint construction of a drainage ditch simply does not require the business activity or contain the profit motive found in the joint extraction of oil or the joint production of electricity by a nuclear power plant.

Following the *Cooperative* cases and the *Bentex* case, Congress reenacted the definition of partnership in the 1954 Code. In addition to carrying the definition forward in section 7701(a)(2) without change, Congress also placed the definition within subchapter K, sec. 761(a), with the added caveat allowing certain organizations to elect to be excluded from the application of subchapter K. Section 761(a) reads as follows:

(a) PARTNERSHIP.—For purposes of this subtitle, the term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a corporation or a trust or estate. Under regulations the Secretary may, at the election of all the members of an unincorporated organization, exclude such organization from the application of all or part of this subchapter, if it is availed of—

(1) for investment purposes only and not for the active conduct of a business, or

(2) for the joint production, extraction, or use of property, but not for the

purpose of selling services or property produced or extracted, if the income of the members of the organization may be adequately determined without the computation of partnership taxable income.

If distribution in kind of jointly produced property is enough to avoid partnership status, we do not see how such distribution could be used as a test for allowing an election to be excluded from the partnership provisions of subchapter K. Although there is no discussion of the reason for the "election-out" provision of section 761(a), in the legislative history of the section it has been generally considered that this provision was enacted as congressional approval of the *Bentex* case coupled with a recognition of the hardships caused by that decision.[14] See D. Williams, "Joint Operation of Jointly Owned Natural Resources," 10 Oil & Gas Tax Quarterly 149 (1961); J. Taubman, "Oil and Gas Partnerships, and Section 761(a)," 12 Tax L. Rev. 49 (1956); D. Flagg, "Tax Treatment of Joint Operations," 6 Oil & Gas Tax Quarterly 28 (1956).

In sum, we hold that petitioner's arrangement with WPS and WPL was an unincorporated organization carrying on a business, financial operation, or venture. To the extent a profit motive may be required for an unincorporated organization to be a partnership for Federal tax purposes, we hold that it is present in this case with the in kind distribution of electricity produced by the nuclear power plant.

Petitioner maintains that even if the arrangement is a partnership for Federal tax purposes: (1) The activities of the partners should be imputed to the partnership, thereby making the training costs not startup costs of the partnership's initial activity but continuing expenses of the partners in their business of producing electricity; (2) the partnership entity should be disregarded as lacking economic substance, again thereby attributing the training cost to the partners and their continuing electricity production; or (3) the partnership began its business

---

[14]Thus, Congress afforded such organizations an election to be excluded from the provisions of subch. K. Petitioner makes some interesting arguments as to the policy reasons for not penalizing it because economies of scale have forced it to combine forces with other utilities to enjoy the advantages of nuclear power. These arguments, however, are misplaced with respect to the question of the definition of a partnership. Instead, they should have been addressed with respect to the effect of the sec. 761(a) election to be excluded from the application of subch. K. In other words, the treatment of petitioner flows from the organization status as a sec. 761(a) electing organization; but petitoner does not argue that favorable treatment flows therefrom and, as discussed in n. 9 supra, we are making no decision on that question in this case.

no later than when the NRC issued a provisional construction permit on August 6, 1968, so that all the training costs thereafter were ordinary and necessary business expenses under section 162(a).[15]

Petitioner's first argument that we should impute the activities of the partners to the partnership in determining the nature of the training expenses is without merit. The case upon which petitioner relies, *Brady v. Commissioner*, 25 T.C. 682 (1955), holds that the acts of partners as partners in furtherance of partnership business are attributable to the partnership for purposes of determining whether property held by the partnership is a capital asset or held for sale in the ordinary course of the partnership trade or business. In that case, the activities of the partners as joint ventures were used to determine the activities of the partnership to ascertain whether the partnership held 68 improved residential lots for sale to customers in the ordinary course of the partnership business. The holding in that case does not support petitioner's contention that "because the intention of the parties may taint the partnership, any activities of the partners must likewise color the activities of the partnership." Nor does it support petitioner's conclusion that the partnership activities should be deemed an extension of the separate activities of the partners.

This argument of petitioner's is nothing more than its substance-over-form argument which we will discuss later in this opinion. Under petitioner's argument, the nature of all items reported on a partnership return of income would have to be considered on the basis of the separate businesses of the partners. This is not in keeping with considering a partnership as a separate business from the businesses of the partners. See *Bentex Oil Corp. v. Commissioner, supra* at 571–572, in which we held that it was incumbent on the partnership and not the

---

[15]Petitioner also maintains that if we do find that the expenditures were capital in nature, we should rule on the amortization periods, useful lives, of the individual expenditures. This issue, however, is raised nowhere in the petition or in petitioner's original brief but is first mentioned in petitioner's reply brief. Therefore, we will not consider the issue. See *Frentz v. Commissioner*, 44 T.C. 485, 490–491 (1965). Also buried in petitioner's reply-brief discussion of useful life is a position arguably within the parameters of the amended petition. Petitioner maintains that 25 percent of the training period was devoted to conventional activities of steam generation without direct relationship to nuclear power and therefore such costs should be deductible. It is clear that all the items were paid for employees who were to work at the nuclear plant. For this reason, the costs were clearly those of the partnership.

partners to elect to expense rather than capitalize intangible drilling costs.[16] The business of the partners cannot be attributed to the partnership for purposes of determining whether expenditures of the partnership were startup costs of the partnership's initial activity.

We also reject petitioner's substance-over-form argument. Admittedly, the theory that the economic substance of a situation, not its form, will prevail for Federal tax purposes is one which can be used by both the Government and taxpayers. Even assuming that in a proper case the form of a partnership as well as that of a corporation may be disregarded for Federal tax purposes (see *Seminole Flavor Co. v. Commissioner*, 4 T.C. 1215, 1234 (1945)), we conclude that this case is not one in which the economic substance differs from its form. The two cases which petitioner cites, *North Jersey Title Ins. Co. v. Commissioner*, 84 F.2d 898 (3d Cir. 1936), revg. a Memorandum Opinion of this Court, and *Baltimore Aircoil Co. v. United States*, 333 F. Supp. 705 (D. Md. 1971), deal with the startup costs of a wholly owned corporate subsidiary. Had the nuclear power plant here involved been owned wholly by petitioner or effectively wholly owned by it through a wholly owned subsidiary, the cases relied on by petitioner would require analysis to determine whether they were applicable to the facts here. However, the nuclear plant in this case was not wholly owned by petitioner outright or through a subsidiary. In the instant case, the economies of scale involved in a jointly owned nuclear power plant were the reason for the joint venture which we have held to be a partnership for Federal income tax purposes. Thus, the economic reality of the partnership in this case is present, where it was not in the wholly owned subsidiary cases, and we find no reason to look beyond the partnership which the three power companies formed.[17]

---

[16]We recognize that under the 1954 Code provisions, when an oil producing partnership has elected under sec. 761(a) not to be subject to the provisions of subch. K, each partner is entitled to make his own intangible drilling cost election. *Morburger v. United States*, 303 F. Supp. 42 (W.D. Ky. 1969). See also *Bernuth v. Commissioner*, 57 T.C. 225 (1971). However, this interpretation of the effect of an election under sec. 761(a) does not detract from the holding in *Bentex Oil Corp. v. Commissioner*, 20 T.C. 565 (1953), that a partnership is a "taxpayer" for purposes of computation of amount of taxable income of its business distributable to the partners.

[17]Petitioner also notes that respondent has been willing to ignore the partnership form of a similar operation for purposes of sec. 48(a)(4) and (a)(5) in Rev. Rul. 78–268, 1978–2 C.B. 10. Petitioner misinterprets this ruling. The ruling effectively recognizes the partnership and holds that the presence of a municipally owned utility and a tax-exempt electric cooperative as joint ventures does not cause the investment credit to be denied to the partnership insofar as use of that credit by the

Petitioner's final argument concerns when the partnership began operation of its business. Petitioner claims that August 6, 1968, the date on which the NRC issued a provisional construction permit, should be considered the date of commencement of the partnership business. Such a position, however, is contrary to well-established case law.

In *Richmond Television Corp. v. United States, supra*, the Fourth Circuit Court of Appeals ruled on an analogous situation. The court held that training costs incurred before and after issuance of a construction permit for a television station were not currently deductible, because the taxpayer television station was not in business until 1956, when its license was obtained and it began broadcasting.[18] When business operations commence is a fact question to be decided under the facts and circumstances of a given case, but in this instance, we find that the facts are not distinguishable from those in *Richmond* and we conclude that *Richmond* was rightly decided. Petitioner argues that the *Richmond* case is distinguishable from the instant case and that the "bank card" cases are strikingly comparable to the instant case.

In *First Security Bank of Idaho N.A. v. Commissioner*, 63 T.C. 644 (1975), we followed *Colorado Springs National Bank v. United States*, 505 F.2d 1185 (10th Cir. 1974), and held that the initial costs of a bank's participation in a credit card system were ordinary and necessary section 162 expenses, because the credit card system was a mere extension of the bank's business, not a new business. There is nothing inconsistent in those cases with the holding in the *Richmond* case. In fact, the Court in the *Colorado Springs National Bank* case distinguished the *Richmond* case on the ground that the expenses sought to be deducted in the *Richmond* case were incurred prior to the licensing of *Richmond* and its commencement of business, whereas in the *Colorado Springs National Bank* case the taxpayer was in the banking business of which the credit card plan was a part when the expenses were incurred. Those cases might lend support to an argument for deduction of the

---

remaining partners is concerned. The ruling states that this result applies whether or not the partnership has made an election out of subch. K under sec. 761(a).

[18]The holding in *Richmond Television Corp. v. United States*, 345 F.2d 901 (4th Cir. 1965), as pointed out in that case, is consistent with Tax Court cases which require the beginning of business operations, not construction, in finding expenses to be currently deductible under sec. 162(a). See, e.g., *Radio Station WBIR, Inc. v. Commissioner*, 31 T.C. 803, 812 (1959).

expenses here involved if petitioner had been constructing the nuclear plant as a wholly owned property. Those cases in no way involve an activity of a newly created entity.

In *First National Bank of South Carolina v. United States*, 558 F.2d 721 (4th Cir. 1977), however, the taxpayer bank was allowed a deduction for fees assessed against it to pay the proportional expenses of a nonprofit corporation of which the taxpayer was a member. The nonprofit corporation was formed to achieve economies of scale in acquiring essential computer services for credit card operations for its member banks. As a member of the association, a bank received no stock, was not entitled to a distribution of profits, and had no interest in the association's assets which upon dissolution went to a tax-exempt organization. The assessment to cover its preoperational expenses was based on expected future use of the association by the banks, depending on their total deposits. In holding payment of the assessment by the taxpayer to be an ordinary and necessary business expense under section 162(a), the court ruled that membership in the association was not a separate and distinct asset of the taxpayer created or enhanced by the payments. See *Commissioner v. Lincoln Savings & Loan Association*, 403 U.S. 345, 355 (1971). The court in the *First National Bank of South Carolina* case considered the taxpayer's payment to be merely the startup costs of its own participation in a credit card system. Because of the nature of the association involved in the *First National Bank of South Carolina* case, that case is distinguishable from the instant case.[19] We therefore hold that the expenses which petitioner seeks to deduct were those of the partnership, not the petitioner, and that as preoperational costs of the partnership's initial activity those expenditures must be capitalized.

The third issue for decision is the fair market value of the two parcels of land contributed by petitioner to the Madison Gas & Electric Foundation (foundation) in 1968 and 1969. On its 1968 Federal income tax return, petitioner assigned a $225,000 fair market value to the first contributed parcel and took a section 170 charitable deduction in that amount. On its 1969 Federal income tax return, petitioner assigned a $200,000 fair market

---

[19]Similarly, we do not find analogous any of the following cited by petitioner: *Flood v. United States*, 133 F.2d 173 (1st Cir. 1943); Rev. Rul. 72–220, 1972–1 C.B. 365; Rev. Rul. 67–12, 1967–1 C.B. 29.

value to the second contributed parcel and took a section 170 charitable deduction in that amount. Respondent agrees that the fair market value of the parcels is deductible as a section 170 charitable contribution, but contends that the fair market value of the two parcels is not in excess of $350,000. Petitioner now contends that the figures of $225,000 and $200,000 used in its return for the value of the two parcels of land were less than the fair market value of the respective parcels on the dates of the donation. Petitioner offered the testimony of an expert witness who stated his opinion to be that the parcel contributed in 1968 had a fair market value of $255,000 when it was donated, and that the parcel contributed in 1969 had a fair market value of $295,000 when it was donated.

Respondent's expert appraiser based his valuation of the donated parcels on reducing the amount of $468,300 received by the foundation for the two parcels when it sold them on February 9, 1973, to the computed worth of $468,300 on December 13, 1968, using an 8-percent interest rate. In his appraisal report, respondent's expert explained the basis of his opinion as follows:

> Therefore, acting on the reasonable presumption that the Horning sale was a valid, arms-length transaction, the market value of subject property could thus be viewed as the present worth on December 13, 1968 of the right to receive $468,300 on February 9, 1973.
>
> The time preference for money would dictate that the $468,300 be discounted at prevailing interest rates for the type of security involved. An 8% return would appear a minimum expection [sic] in view of then prevailing rates.
>
> The present worth factor for $1.00 to be received 4 years hence, and discounted annually at 8% compounded, is taken from tables to be .735030.
>
> Thus, present worth of $468,300 to be received in 4 years, discounted at 8% annually, is:
>
> $$\$468,300 \times .735030 = \$344,215$$
>
> \*     \*     \*     \*     \*     \*     \*
>
> I would round out the appraisal estimate to $350,000, consistent with appraisal practice, to avoid implying a degree of accuracy impossible in attain [sic] in such a speculative study.
>
> It is, therefore, my opinion, based on the aforementioned data and rationale, that the subject parcel had a market value as of December 13, 1968 of $350,000. The term "market value" is defined in Exhibit H.

We question the appropriateness of valuing the two parcels at a date on which neither was contributed, particularly when one parcel is smaller than the other. However, there is some testimony in the record to support no great variation in fair

market value of property in Madison, Wis., between mid–1968 and mid–1969 and that properties the size of those involved in this case might be valued on an acreage or square footage basis. However, the method used by respondent's witness does not, in our opinion, indicate fair market value of the two parcels at December 13, 1968. If, in fact, as this method seems to assume, the property had the same value from 1968 through 1973, a penalty is placed on the seller by respondent's computation for not selling the property sooner. Since here we are dealing with fair market value and not the foundation's real estate expertise, if an assumption of no change in fair market value during this period is proper, the fair market value should, for purposes of this case, be determined to be $468,300 when the property was donated. There is some indication in this record that values of land of the type donated by petitioner to the foundation were depressed in 1973 because of the placing of a large parcel on the market, although the record indicates some increase in land values in general in Madison between 1968 and 1973.

Although we do not accept the computation made by respondent's witness as being indicative of the fair market value of the two donated parcels of land on the dates on which they were contributed, there is in the testimony of respondent's witness information indicative of fair market value of property suitable for building of apartments. We have put in our findings information with respect to sales of land for use as sites for apartments which came from testimony of respondent's expert witness. Although there is nothing specific in this record to indicate that any one of these sales was of property comparable to the donated property here involved, the overall indication from the schedules is that at least some property sold for erection of apartments in the Madison, Wis., area during 1968 was at a price ranging from $800 to $1,000 per dwelling unit, and the only sale listed in 1969 was at $1,015 per dwelling unit.

The record shows that the approximately 24 acres here involved would support 772 dwelling units. However, the sales of other property were in smaller parcels than that here involved. The nearest parcel in size to the ones here involved was 17.66 acres sold in March 1968 at a price of $1,000 per dwelling unit, or $19,800 per acre. Also, there is nothing to indicate that any of the parcels with respect to which sales dates are available required the soil preparation before dwelling units could be

constructed that the 24 acres here involved would require. Nevertheless, if the property here is to be considered of a highest and best use for apartment buildings and an average price per dwelling unit in 1968 and 1969 of $800 used, the total fair market value arrived at without consideration to the soil difficulties of the 24 acres is $617,600. If it were considered that $200,000 would be required to place the soil in condition for building of apartments, the result would be a computed value of $417,600 for use of the 24 acres as an apartment site, which closely approximates the $425,000 value used by petitioner on its return for the two properties.

Whereas respondent's expert considered the highest and best use of the property to be for the building of apartments, petitioner's expert considered its highest and best use in 1968 and 1969, the dates of the donations, to be the M–1 industrial and commercial zoning which the property had at the time it was donated. Petitioner's expert based his valuation of $255,000 for the parcel contributed on September 6, 1968, on an industrial valuation of 50 cents per square foot, and his value of $295,000 for the parcel contributed on March 20, 1969, on an industrial value of 55 cents per square foot. We have set forth in our findings the sales of industrial properties which petitioner's expert considered as comparable. It will be noted that all of these parcels were of much smaller areas than the donated parcels here involved. Also, although all parcels, except one used as comparable by petitioner's expert, range in price from 66 cents to 92 cents a square foot, the sale made on January 4, 1968, the date nearest to the date here involved, was at 26 cents per square foot.

When these factors are considered in conjunction with the fact of the soil difficulties with the land here involved, in our view the estimate of petitioner's expert witness of 50-cents-per-square-foot fair market value of the donated property on September 6, 1968, and 55 cents on March 20, 1969, is overly optimistic. Making allowances for these various factors, it would appear that a value of 40 cents per square foot would be more nearly accurate. Using 40 cents a square foot for the two parcels would result in a fair market value of approximately $204,000 for the parcel donated in 1968 and $213,000 for the parcel donated in 1969.

Considering the testimony of respondent's witness with re-

spect to value of the property for multifamily dwellings and the testimony of petitioner's expert of its value for M–1 industrial and commercial use, adjusted for the overly pessimistic view of its value evidenced in the opinion of respondent's expert and the overly optimistic view of its value evidenced in the testimony of petitioner's expert, we conclude that the value of the two parcels of land in the fall of 1968 and the spring of 1969 totaled somewhere between $415,000 and $430,000. This valuation is also confirmed by the offer of $420,000 received by the foundation for the land in late 1969. Apparently this offer was on the basis of the land being used for multifamily dwellings, although the record is not clear in this regard. Respondent discounted the evidentiary value of the $420,000 offer since it was based on a land contract. Since there is no showing in the record of the interest to be paid on the land contract or other details, we would certainly not accept the offer of the $420,000 for the property on a land contract basis standing alone as conclusive of the minimum value of the property. However, when this offer for the property is considered in conjunction with all the other evidence of record, it does appear to be quite close to the fair market value of the property at the time the offer was made.

Considering the evidence as a whole, we conclude that the $425,000 value initially used by petitioner on its return is in fact the fair market value of the two parcels. However, there is nothing in the record to indicate that the small parcel contributed in 1968 was superior to the larger parcel contributed in 1969. For this reason we arrive at the $425,000 by valuing the parcel contributed in 1968 at $205,000 and the parcel contributed in 1969 at $220,000. We arrive at these values after considering all the testimony given by the experts in this case as well as all the other evidence of record.

*Decision will be entered under Rule 155.*